ULYSSES PRATT AND OTHERS *vs.* PRATT, READ AND COMPANY.

Where a corporation is about to exceed its powers by applying its property to objects not authorized by its charter, a court of equity will interfere in behalf of a dissenting minority of the stockholders.

The corporation and its directors are trustees for the stockholders, and as such fall under the supervision of courts of chancery.

But where a manufacturing corporation had a large surplus above its stated capital, which the directors, with the concurrence of a majority of the stockholders, were about using for the purpose of extending the business of the company and erecting an additional factory against the objection of a minority of the stockholders, but it appeared that the business as extended was within the powers of the corporation, and that the stated capital of the company was much less than the amount actually used and necessary for its ordinary operations, it was held, on a bill brought by the dissenting minority praying for an order that the surplus be divided among the stockholders and the company be enjoined against erecting the new factory, that the facts were not such as to require the interposition of the court in behalf of the minority.

BILL FOR AN INJUNCTION, brought to the superior court for Middlesex county.

The bill alleged that the petitioners in the year 1863 associated themselves with Julius Pratt, Henry C. Butler and others as a joint stock corporation by the name of Pratt, Read and Company, under the statute with regard to such corporations, for the purpose of manufacturing and selling ivory, bone, shell and wood combs, and piano and melodeon

Pratt *v.* Pratt, Read & Co.

ivory, and other articles made in part or in whole of ivory; that the capital of the corporation was $175,000; that the petitioners were owners of a minority of the stock; that the corporation had been and was still engaged in a profitable business, but that the directors had combined with the owners of a majority of the stock to misapply the funds of the corporation; that there was a surplus of earnings in the hands of the treasurer amounting to $125,000 which the petitioners had insisted upon having divided, but the directors had refused; that the company was proceeding, through the directors and without any vote of the stockholders, to erect a large and expensive building for the purpose of extending their business beyond what was contemplated when the company was formed; that the petitioners were in need of their share of the surplus for their individual purposes; and that the directors and the majority of stockholders were acting fraudulently and in disregard of the interests of the petitioners, and were conspiring together to secure their own private interests by means of the corporate organization and funds and to injure the interests of the petitioners. The bill therefore prayed for an injunction against the corporation, forbidding it to proceed with the erection of the building, and for a decree that the corporation divide among the stockholders the surplus funds on hand.

Upon the bill and the answer of the respondents the court found the following facts :—

The respondents, a joint stock corporation under the name of Pratt, Read & Co., was on the 6th day of October, 1863, duly organized and located in the town of Meriden and county of New Haven, with a capital of $175,000 dollars, divided into seven thousand shares of $25 dollars each, for the " purpose of manufacturing, selling, and dealing in all kinds of ivory shell, horn, bone, rubber, wood and other combs, all kinds of piano and melodeon ivory, and other articles made in whole or in part of ivory, shell, bone, india rubber, gutta percha, composition, wood or metal, and to purchase, hold, sell, and deal in all real and personal estate necessary and convenient for the prosecution of said business, and generally

to do all acts connected with or incidental to said business or the prosecution of the same." The stockholders of the corporation are exclusively composed of the former members of the firms of George Read & Co. and Pratt Brothers & Co., late of Saybrook in Middlesex County, and the stockholders in the former corporation of Julius Pratt & Co., late of Meriden. The petitioners are the former members of said copartnership of Pratt Brothers & Co., and now own 1441 shares of the stock. The remaining 5559 shares are owned and held by those individuals who formerly composed said copartnership of George Read & Co. and said corporation of Julius Pratt & Co. One of the principal objects in the formation of the new corporation by the consolidation of said copartnerships and corporation, was to secure as far as practicable uniformity in prices, and certainty in profits, and to that end it was understood by all concerned that the respondents were not to receive and be prejudiced by any competition from any of its own stockholders, and that they should not carry on the same business independently of the business of the respondents.

In June, 1864, Ulysses Pratt, one of the petitioners, purchased from the Deep River Ivory Comb Company, a corporation located in Saybrook, their factory, machinery, fixtures and privileges, and in February or March, 1865, formed a copartnership with other persons, and commenced and still carries on thereat the business of manufacturing ivory combs, and sells their manufactured goods in competition with the respondents.

At the time the respondents were organized, the real and personal assets of the corporation of Julius Pratt & Co. and of the copartnerships of George Read & Co. and Pratt Brothers & Co., was appraised by persons mutually selected at $446,000, which was held in the following proportions, to wit: by Julius Pratt & Co. $258,511, by George Read & Co. $89,593, and by Pratt Brothers & Co. $97,917, and in the subscriptions to the capital stock of the respondents the members of said corporation of Julius Pratt & Co. and of said copartnerships of George Read & Co. and Pratt Brothers & Co., subscribed and owned in the same proportions. The remain-

der of the real and personal estate of said corporation and copartnerships, amounting to $271,000, after deducting and applying the capital of the respondents, $175,000, was taken by the respondents, and the notes of the new corporation given, in the same proportions that the stock was subscribed, to said corporation of Julius Pratt & Co. and said copartnerships of George Read & Co. and Pratt Brothers & Co. All the notes so given to George Read & Co. and Pratt Brothers & Co. were paid at maturity, and all those given to said corporation of Julius Pratt & Co. had been paid at the time of the bringing of the suit, except about $36,000, which for the accommodation and convenience of the respondents had been extended and allowed to remain over-due.

At the time of the organization of the new corporation there was a general understanding by the parties that the notes should be paid at its convenience, and that they should be extended to suit its convenience in the reasonable prosecution of its business, and that the payment of these notes to the holders should be received by them in lieu of dividends, until they were all cancelled and discharged; but the petitioners Alexis Pratt and Felix A. Dennison were not cognizant of and did not participate in that understanding, and it did not clearly appear that the other petitioner, Ulysses Pratt, did.

At the time of the bringing the petitioners' bill, to wit, on the 8th of March, 1866, the outstanding indebtedness of the respondents was about $72,000, of which $30,000 was matured and had been extended as aforesaid, and the respondents had then on hand in cash $21,000, and a surplus of property and earnings including said cash of about $130,000. This surplus, aside from said $21,000 in cash, consisted of stock, manufactured goods, and some $50,000 in paper, taken on short time, upon the sales of manufactured goods at their agency in New York. The amount and value of the respondents' surplus was arrived at by an inventory and estimate of its assets, made, so far as that portion which consisted of manufactured goods was concerned, at 28 per cent. below the selling prices in market.

The building now in process of erection by the respondents in Saybrook is designed for the manufacture of piano key boards, a business incidental to the manufacture of piano keys, and, if carried on to a considerable extent by the respondents, requires the additional room and power and expenditure contemplated in the building and improvements which the respondents have commenced to erect and make, and which, with the machinery and fixtures, and the necessary additional outlay in lumber and materials, will call for some $30,000 or $35,000.

The directors of the corporation at the time of its organization contemplated the prosecution in some manner of this branch of business, and the said Ulysses Pratt was then and for some time thereafter one of its most earnest advocates; but the petitioners have never been in favor of conducting it at so great expense, or so as to interfere with the payment of fair and reasonable dividends; and the successful prosecution of the business has not yet been fully established, and at the time of the commencement by the respondents of said building, and at other times since, the petitioners have objected to and remonstrated with the directors and insisted upon having their share of the earnings of the corporation paid to them, and the said Alexis Pratt has little other means or source of income for the support of himself and family, and needs whatever justly belongs to him as the avails of his stock and interest in the corporation.

The corporation has made no dividends since its organization, except one of five per cent. in July, 1865, which was declared for some purpose connected with the United States income tax; and at the same meeting at which the dividend was declared, the said Ulysses Pratt, acting for himself and as agent of the other petitioners, desired and moved a dividend of forty per cent., which motion was rejected.

The business of the corporation has from its organization been and still is very prosperous, but it has not cash funds to pay its debts, erect and make the contemplated buildings, improvements and expenditures, and pay a dividend; and if it assumes or undertakes to do all these at present, it must

either borrow money to a considerable amount or force the sale of its manufactured goods at a loss; but if the erection of the new building and the prosecution of the piano-key board business is abandoned, it can safely make a liberal dividend from its accumulated profits. Its property cannot be forced upon the market and disposed of faster than by its regular sales at its agency in New York without material sacrifice, and the present tendency in the prices of its goods is somewhat downward, partly in consequence of sales at under prices made by Pratt, Smith & Co., a corporation of which the said Ulysses Pratt is a member and agent, and partly from other causes connected with the business of the country; and to conduct the business successfully a large capital in said material and manufactured goods is necessary, and a much larger sum than $175,000 is required, unless a considerable amount in surplus can be retained and employed for that purpose. The corporation through its directors has acted in the premises without malice, improper motive or fraud towards the petitioners or either of them, and in the management of its business and concerns has exercised what they believed to have been a sound and reasonable judgment and discretion.

Upon these facts the case was reserved for the advice of this court.

*Dutton* and *Chadwick*, for the petitioners.

1. The company was organized with a capital stock of $175,000, about one half of which was invested in real estate and machinery, and the other half reserved for working capital. The petitioners subscribed for their stock with the understanding, and on the representation, that this capital was all that was necessary for doing the proposed business of the company. There was therefore an implied contract between the petitioners and the company, that the company should pay over to the petitioners the fair earnings of their proportion of the capital stock. There is a clear legal distinction between the capital stock and the earnings of a corporation. The corporation is to use the money furnished

by a stockholder as a part of the capital stock, for the benefit of such stockholder.   The fact that the capital stock is always limited shows that the contract between the corporation and the stockholder extends only to the stock named.   The earnings belong to the stockholder.   The corporation would have the same right to order a stockholder to pay in additional stock, as to take the earnings of a stockholder and make capital stock of it.   The statute providing for the increase of the stock of a joint stock company, shows that the directors alone could not increase the capital stock.   Rev. of 1866, p. 170, sec. 394.   It has been repeatedly decided that the directors of such a corporation as this can not use the stock in an additional although apparently beneficial business.   *Stevens* v. *South Devon Railway Co.*, 2 Eng. L. & Eq., 138 ; *S. C.*, 15 Jurist, 235 ;. *Burmester* v. *Norris*, 8 Eng. L. & Eq., 487 ; *S. C.*, 6 Exch., 796 ; *Ffooks* v. *London & South Western R. R. Co.*, 19 Eng. L. & Eq.; 11 ;   *S. C.*, 17 Jurist, 366 ; *Stevens* v. *Rutland & Burlington R. R. Co.*, 29 Verm., 545. It has also been decided that a corporation can not increase its capital by borrowing money.   *Burmester* v. *Norris*, supra. But under the circumstances of this case, applying the earnings to increase the capital would extend the payment of the debt, which would amount to the same thing as borrowing money.   If a corporation is ever justified in applying the earnings to any other purpose than paying dividends, the power would be limited to the necessity of making the business answer the object of the corporation.   No such necessity exists in this case.   To allow the directors an unlimited discretion in enlarging a business would enable them to hazard the whole stock of a stockholder.   The fact that the directors are not influenced by improper motives makes no difference. If the corporation had the right to retain the profits for any purpose it would be to pay its debts.   But the directors in this case are delaying the payment of the debts.   They are applying the funds which ought to be applied to or reserved for the payment of debts, to building a factory.   The facts found show that the debts remaining due were in such a situation that reasonable dividends could be declared.   The

company has been in operation since 1863. It has earned a surplus of $130,000, has never paid a dividend but once, and that a small one merely to meet an income tax on the stockholders. The business has been remarkably prosperous and successful with their present capital ; the corporation by continuing as originally contemplated, " could declare liberal dividends." It does not need any accession of capital. The directors propose to engage in a new business in which they have had no experience, which is admitted to be an experiment, and which they hope to be able to build up. It is a business also which was never contemplated by two of the petitioners, and never contemplated to the extent of requiring any additional capital by any of them, and a business which requires an extension' of their capital to a large amount. For this purpose the directors propose to permanently increase the capital of the company by taking the surplus earnings and converting them into permanent capital, without consent of the petitioners, and without even the formality of a stockholders' meeting to authorize them. If the directors or the company can thus turn their earnings into permanent capital without paying dividends, why may they not increase their capital indefinitely, and continue to deprive the stockholders of the fair earnings of their money. The whole property of Alexis Pratt is invested in this stock. He is assessed on an income from it of over $5,000, and has to pay a tax of over $250, with hardly a dollar of his own to pay it with, and the company refuse even to make a dividend which will enable him to pay his tax. It is no answer to say that he can sell a portion of his stock and thus raise money to pay his taxes, or that if he does not like an investment which does not pay dividends he may sell out his stock ; others may not like that kind of an investment any more than he does, and will not purchase at such a price as his stock if properly managed is worth. At all events he has a right to his stock, and a right to its earnings.

2. The stockholders have a remedy by injunction. Ang. & Ames on Corp., §§ 392, 547, 556, 560. *Scott* v. *Eagle Ins. Co.*, 7 Paige, 198 ; Pierce on Am. Railway Law, 508 ;

Redfield on Railways, § 174. And the suit was properly brought against the corporation. *Sears* v. *Hotchkiss*, 25 Conn., 171, 177.

*Doolittle*, for the respondents.

1. The respondents are a corporation, composed of two firms and one corporation, whose real and personal assets, exclusive of cash, amounting to $446,000, were transferred to and vested in the respondents at the time of their organization. Their assets, inclusive of cash at the time of the commencement of this suit, were only $375,289, having been reduced more than $70,000. It is therefore obvious that this company is carrying on a more extensive business with a less capital than the firms that it succeeds and represents, and is using the same properly and profitably.

2. It is found that a much larger capital than $175,000 is necessary to carry on this business. The business itself is peculiar in respect to the capital required. The contract for ivory is made a year beforehand, their orders are given, and then the importer sends to Africa for it, and $100,000 and upwards is invested for months in the raw material. They have to carry an immense stock at their store in New York, in order to have a full assortment to supply the trade. The demand is limited and sales can not be forced. The directors, men of the largest experience, have acted without malice or improper motives, and according to their best judgment for the interest of the company. All these facts are found. One of the principal objects to be obtained by the creation of the corporation was to avoid a ruinous competition among the present stockholders. Yet these petitioners set up a rival business and are desirous of crushing that of the corporation.

3. The proposition is advanced that a corporation judiciously managed by its directors, shall not be permitted to use, to such an extent as its managers deem necessary, its accumulated earnings in the prosecution of its business. If the directors judged it proper, to carry on their business, to borrow money, they could do so. Ang. & Ames on Corp., § 231 ; *Savings Bank and Building Asso.* v. *Meriden Agency*

Co., 24 Conn., 164. Now if they could borrow they could certainly use their own money and not borrow.

4. The directors are vested by law with the care and management of the property and business of the corporation. Rev. of 1866, p. 171, sec. 397. The stockholders of this corporation have seen fit to select, as by law they might, gentlemen of the highest integrity and of life-long experience in this particular business, to manage its affairs, and so long as they manage reasonably in their judgment and the judgment of a majority of the stockholders, they ask that they and not the Court of Errors may be permitted to manage them. Ang. & Ames on Corp., § 279. An interference by the court, in a case like this, would utterly destroy the manufacturing business of the state.

HINMAN, C. J. The petitioners seek in this case the aid of a court of equity to compel the respondents, a joint stock corporation, to declare and pay over to its stockholders a reasonable dividend out of its surplus earnings; and also to enjoin it from making farther expenditures in the erection of a large factory building for the purpose of enlarging its business and thereby exhausting its surplus funds, to the injury of the petitioners, who are a minority of its stockholders opposed to such enlargement. The petitioners make in their petition a very strong case for the equitable interference of the court in their behalf. And if it had been sustained by the facts found by the court, we could have no hesitation in granting them the relief asked for. Where a corporation is about to exceed its powers by applying its property to objects beyond the authority of its charter, it is well settled that a court of equity will grant relief to a minority of its stockholders, who dissent from such use of its funds. *Hartford & New Haven R. R. Co.* v. *Croswell*, 5 Hill, 383 ; *Stevens* v. *Rutland & Burlington R. R. Co.*, 29 Verm., 545 ; *Sears* v. *Hotchkiss*, 25 Conn., 171 ; *Scofield* v. *Eighth School District*, 27 id., 499.

Indeed this doctrine necessarily results from the principle which underlies the cases, that the corporation and its direct-

ors, are trustees, and as such may be called into a court of chancery, either for an account, or to restrain them from mismanagement of the corporate property, especially for a fraudulent mismanagement of it, or for the purpose of compelling the corporation and its directors to declare dividends from its surplus earnings, where such dividends are needlessly and improperly withheld. *Robinson* v. *Smith*, 3 Paige, 222; *Scott* v. *Eagle Ins. Co.*, 7 id., 198. Indeed joint stock companies in modern times are nothing but commercial partnerships, which have taken the form of corporations for the greater facility of transacting business, and to prevent a dissolution of the concern by those numerous events which are so liable to work a dissolution in a partnership composed of a great number of individuals; and they must have applied to them principles making them accountable like all trustees, or the grievance would be intolerable, since otherwise a majority of the stockholders, acting through the directors, who would thus cease to be in fact what the law considers them, the agents of the whole body of stockholders, and would become the private agents of the majority, might set the minority at defiance, and manage the affairs for their own supposed benefit and the benefit of the majority who appointed them. The true doctrine upon this subject appears to us to be very fairly and correctly stated by Chancellor Walworth, in the case of *Scott* v. *Eagle Ins. Co.*, 7 Paige, 203, where he says, that " as the directors are bound to exercise a proper discretion in making dividends of surplus profits, if they abuse that power by dividing the unearned premiums without leaving sufficient to satisfy the probable losses, they may, in case of any extraordinary loss which is sufficient to exhaust the whole capital and more, make themselves personally liable to the creditors of the company. On the other hand, should they without reasonable cause refuse to divide what is actually surplus profits, the stockholders are not without remedy, if they apply to the proper tribunal before the corporation has become insolvent." The surplus of this corporation over its nominal capital which the petitioners seek to have divided is so large, and bears so great a proportion to

the capital, that we have felt the necessity of stating our views of the principle which should govern in determining questions of this sort the more distinctly, in order to prevent the case from being used as a precedent against ordering a dividend to be made, where there is confessedly a large surplus over the capital on hand, and no reason can be given for withholding it from the stockholders except the mere will of the directors acting by the advice of a majority of the stockholders. In cases of this description the question must always be, where a surplus is asked to be divided, and the directors refuse to declare a dividend, whether there is a reasonable cause for withholding it. Now in the first place, before a dividend is ordered to be made, it should appear clearly that there is a surplus to be divided. In this case the surplus appears to be very large in reference to the nominal capital of the company; but when examined in reference to its actual capital, it is otherwise; and we think we find a sufficient reason in this fact for not ordering a dividend. In the first organization of the corporation the sum of $175,000 was named as the nominal capital in the articles of association. But it is evident from all the facts in the case that the actual capital was much larger and consisted of all the property purchased of the individual stockholders, who had all been engaged in the business contemplated to be carried on by the company, which was of the agreed value of more than $400,000; the difference being made up to the stockholders by the corporation notes, which were expected to be paid, as they principally have been out of the subsequent profits of the business, and not by an immediate sale of any large portion of the assets thus purchased of its stockholders. It could not have been the intention to force the sale of this large amount of property. This could not have been done without great sacrifice, and if such had been the intention the corporation never would have purchased it. They therefore must have intended to use it as a part of their capital, or to keep it on hand as surplus until that part of it which consisted of manufactured goods could be sold, in the regular course of business, with which all the stockholders were familar. There is no evidence that they

have not converted their manufactured goods into cash as fast as it can be done in the successful prosecution of their business, and to order them to do it faster than this is simply to order them to make needless sacrifices. The reason for stating the amount of their capital at so much less than it actually was does not appear, and it is not very important that it should. It is enough to say of it, that while it is not a course to be recommended for general adoption, the finding in this case is very full to the effect that nothing improper or fraudulent was intended by it; and the success of their business fully sustains the finding, that the directors have in all their transactions exercised a sound judgment and discretion.

Again, the court finds that it was the general understanding of the stockholders that their notes against the corporation, given for the largest part of the property purchased at the time of the organization, as they should be paid, should be regarded and received by them in lieu of dividends, which implies certainly that no dividends should be declared until that large indebtedness was paid; and this has not yet been done, by some thirty thousand dollars. But there was as much reason for declaring a dividend when the corporation was first organized as there is now, except so far as the comparatively small sum in cash on hand is concerned. As then the business appears to have been honestly and discreetly managed, and as it is found moreover that to conduct it successfully requires a much larger capital than $175,000, unless a considerable surplus is retained; and as we believe it to have been the intention of the stockholders in the organization of the company to retain a surplus to at least the amount of its capital for that purpose, and as the ordering of a dividend would necessarily involve the sacrifice of a large amount of manufactured goods at a forced sale, it appears to us that it would be very inequitable and unjust to the managing majority to advise the superior court to order such a dividend to be made.

The remaining question is, whether the corporation ought to be restrained from erecting their new factory, for the man-

ufacture of piano key boards.   The directors at the time the corporation was organized contemplated the prosecution of this business.   The articles of association state the purpose of the organization to be to manufacture, sell and deal in all kinds of ivory, shell, horn, bone, rubber, wood and other combs, and all kinds of piano and melodeon ivory, and other articles made in whole or in part of ivory, shell, horn, bone, India rubber, gutta percha, composition, wood or metal, and to purchase &c., and to do all acts connected with or incidental to the said business or the prosecution of the same. It is not very strenuously claimed but that the manufacture of piano key boards, as connected with the manufacture of all kinds of piano ivory, and especially of all other articles made in whole or in part of ivory, composition, wood or metal, comes within the contemplated purpose of the corporation, as expressed in the articles.   The question therefore in this part of the case is confined merely to whether the contemplated expenditure for this new factory is so great as unnecessarily and unreasonably to hazard the petitioners' stock. On a question of this sort much must necessarily be left to the discretion of the managing directors, and so long as they keep within the objects contemplated by the articles of association, and the expenditure is not unreasonable in reference to the amount of their capital, a court of equity ought very seldom to interfere with them.   In the organization of these companies, parties, if they see fit to do so, can provide specifically as to the business that shall be transacted, and if they omit to do this, but on the contrary express the purposes of the organization in such general terms as to admit of a very large discretion in the management of their business, the presumption is that it was intended that the discretion of the managers in this respect should be unlimited.   There is nothing in the articles here that shows any intention to limit the discretion of the managers in respect to the particular business contemplated, except it be the naming of a sum as the amount of the capital.   This in most cases would and ought to be some guide in respect to the amount that it would be reasonable to expend in permanent fixed property and ma-

chinery ; but this, in this case, appears to have been fixed without much reference to the amount of business to be done. We feel therefore that it is impossible for us to say that the expenditure of some $35,000 for this new factory is so clearly extravagant and disproportioned to the amount of capital stock as to justify the court in enjoining against it. We therefore advise the superior court to dismiss the petitioners' bill.

In this opinion the other judges concurred ; except CARPENTER, J., who having heard the case upon a motion to dissolve the injunction in the court below, did not sit.