(9 Misc. Rep. 578.)

HISCOCK et al. v. LACY et al.

(Supreme Court, Special Term, Onondaga County. September, 1894.)

1.. CORPORATIONS—DECLARING DIVIDENDS—ACTION TO COMPEL.
Where the surplus of a corporation, properly applicable to dividends,. is ample for that purpose, and the directors, in bad faith and without reasonable cause, refuse to declare a dividend, an action will lie to compel them to do so.

2. PLEADING—OBJECTIONS WAIVED.
The objection that an action by a stockholder to compel the directors to declare a dividend is brought in his own behalf only, and not also in behalf of all other stockholders who might come in and unite in an action, is. waived, if not raised either by demurrer or answer. Code Civ. Proc.. §§ 488, 498, 499.

3. NATIONAL BANKS—ACTIONS AGAINST—JURISDICTION OF STATE COURTS.
Under St. U. S. 1888, c. 866, § 4, providing that in actions against national banks the federal courts "shall not have jurisdiction other than such as they would have in cases between individual citizens of the same state," an action to compel the directors of a national bank to declare a. dividend may be maintained in a state court.

Action by Frank Hiscock and others against Henry Lacy and others to compel payment of a dividend by the Third National Bank of Syracuse. Judgment for plaintiffs.

Frank H. Hiscock, for plaintiffs.
Louis Marshall, for defendants.

VANN, J. The Third National bank of Syracuse, one of the defendants, is a national banking association organized many years ago under the federal banking act, and the other defendants are its directors, Mr. Henry Lacy being also its president. The plaintiffs are stockholders, holding 1,243 shares of stock, worth at par the sum of $124,300. The largest stockholder among the plaintiffs is. Senator Hiscock, who owns and controls 914 shares, while the largest stockholder among the defendants is Mr. Lacy, who holds in his own: name 1,782 shares, and as executor of the estate of Lucius Gleason, deceased, 474 more, thus having a voting power upon 2,256 out of the 4,000 shares of the bank's stock, or an absolute majority.

For years prior to 1887, Lucius Gleason and Frank Hiscock, both large stockholders, acting in unison, had controlled the management of the bank, apparently to the satisfaction of all concerned. Mr. Gleason was president, and, in the discharge of his duties, was accustomed to advise with Mr. Hiscock, who was vice president. They were in entire accord as to the general policy to be pursued in man-

aging the affairs of the bank. It was understood between them that all stock of the bank purchased by either should be for the joint benefit of both, and this understanding was faithfully adhered to. There had been no contest over the election of directors or otherwise, and regular dividends were declared and paid semi-annually at the rate of 8 or 10 per cent. each year. The bank prospered, and all were satisfied.

In 1887 differences arose between these two gentlemen over a large loan made by the bank, through Mr. Gleason, to the El Oro Mining Company, which had become insolvent. Mr. Hiscock was so severe in his criticism of this loan that finally Mr. Gleason indorsed the paper, amounting to between $60,000 and $70,000, in his own name, but afterwards refused to pay more than $30,000 thereof, and the bank lost the remainder. Bitter feelings resulted, and owing to their estrangement a contest arose between these men over the election of directors held in January, 1888, in which each tried to secure control of the board, and Mr. Hiscock succeeded. Thereupon, Mr. Gleason was retired from the position of president, which he had since the organization of the bank, but was made vice president, while Mr. George P. Hier was elected president, and Mr. Leonard, the old cashier, was continued in office. Mr. Lacy, a nephew of Mr. Gleason, and for some years prior a director of the bank, was not re-elected; and the management passed to the substantial, but not exclusive, control of the Hiscock interest. This action was deeply resented by Mr. Gleason, who regarded it as a personal affront; and he at once devised a plan to punish those who had heaped indignity upon him, as he thought, and with secrecy and adroitness he carried it into effect. His custom of purchasing stock on joint account was no longer followed, but he quietly bought enough to give him a controlling interest; taking the precaution, however, not to have it transferred on the stock book, which would have warned the existing management, until in time for the annual election in January, 1889, when, having the power, he used it to turn out of the board of directors Mr. Hiscock, Mr. Hier, and their friends, all of whom had been directors for years, and some ever since the bank was organized, and to fill their places with his own friends and relatives. Mr. Gleason became president, Mr. Niver, vice president, and Mr. Leonard, the cashier for 16 years, was compelled to surrender his office to Mr. Lacy, one of the bookkeepers, who, up to that time, had had little experience to qualify him for so important a position, although he soon developed into an excellent business man. Mr. Tolman, a friend of Mr. Hiscock, and the owner of considerable stock, was deprived of his place as inspector of elections, which he had filled for a long time, and a clerk in the office of Mr. Gleason's attorneys was chosen in his stead. Mr. Hiscock, and all who had acted with him in opposing Mr. Gleason, except Mr. Giles Everson, were deprived of any voice in the management of the bank, although they owned more than one-third of its stock, which at that time amounted to but $300,000. The new directors, aside from Gleason and Lacy,

did not own 200 shares, all told. Mr. Everson, although elected director, did not see fit to accept, under the circumstances, partly, at least, because he was informed by Mr. Gleason that he should discontinue the payment of dividends, as it would promote his personal interest, and was not material to the stockholders. The evidence discloses no reason for such a sweeping change of directors, except the desire of Mr. Gleason to elect men who would represent his views and do his will. The most of the new directors were small stockholders, and apparently only nominal owners of the stock standing in their names; and, while all were eminently respectable gentlemen, they did not all compare favorably in business experience or ability with those whom they supplanted. Two were brothers of Mr. Gleason, one of whom lived with him and was his agent. Among the others, one was related to Mr. Lacy, and was in Mr. Gleason's employment, another was a heavy borrower at the bank, while another still was Mr. Gleason's attorney, but a man of exceptional ability in his profession. All of them sustained such relations to Mr. Gleason or to the bank as to give him a powerful, if not controlling, influence over their action as directors. To some of them stock was transferred by him apparently for the purpose of qualifying them to act in the board of directors, and all of them knew that they held their positions subject to his pleasure, as he could turn them out at any annual election.

Mr. Gleason was greatly elated over his success in thus getting permanent control of the bank, and said that he never enjoyed anything more than voting out those people who had voted against him, that it had come out exactly as he planned it on the night after his defeat, that it would be some time before Mr. Hiscock and his friends would get any dividend on their stock, and that he now proposed to dictate the policy of the bank to suit himself. As a part of that policy, he announced that he did not propose to pay any more dividends for some time to come, and refused to say when dividends would be resumed. No dividend has since been declared, although the condition of the bank would at all times have warranted it; and as long as he lived, although frequently urged by the largest stockholders, other than himself and Lacy, to at least allow a dividend large enough to pay the taxes on the stock, he persistently refused to do so, stating that the bank was doing well, and that he preferred to accumulate a large surplus and do more business, rather than declare dividends. When Mr. Hiscock suggested that he was trying to "freeze out" the minority stockholders, and proposed that each should put up his stock, and let the other say what he would give or take, Mr. Gleason declined, and said he had all the stock he wanted. To another stockholder, who asked him to buy his stock, he said he did not want to buy any more, because he had a majority, and, as he did not propose to make any more dividends for some time to come, he did not want any more stock to hold. He did, however, offer par for some stock, and purchased some at that rate when it was worth a good deal more. When asked to sell a controlling interest in the bank, he refused to

do so, saying that his bank stock was the best-paying property he had. The withholding of dividends depressed the market price of stock, and tended to force the outside stockholders to sell for less than their stock was worth.

Mr. Lacy co-operated with his uncle in obtaining control of the bank, and in his policy of excluding the minority from any representation in the board of directors, as well as in the nonpayment of dividends. He stated in 1888, to a near relative, that he and his uncle would buy up a controlling interest in the stock, and then they would have the Hiscocks' money to use. He told Mr. Hiscock on one occasion that it was not for his interest to make a dividend, because he was paying no interest on the notes he had given to Mr. Gleason for his stock, and, if dividends were paid, Gleason would take them, but if they were allowed to accumulate he would himself have the benefit of them.

Mr. Gleason was a bachelor well advanced in years, with impaired health; and Mr. Lacy, although not his nearest, was apparently his favorite, relative. The title to much of the stock bought by Mr. Gleason to get control of the bank was taken in Mr. Lacy's name, until at last he held nearly 2,000 shares, for which he had given his notes to Mr. Gleason, payable on demand, and had turned over the stock as collateral security. Mr. Lacy was not then a man of financial strength, and could only pay the principal of his notes by means of the stock, or the interest upon the notes, if he had been required to pay interest, through dividends upon the stock. In fact, he paid no interest on his notes. Owing to his indebtedness, he was enabled to avoid the payment of taxes on the stock; and thus Mr. Gleason, who controlled and still equitably owned it, was enabled to obtain relief from taxation thereon. The arrangement was ingenious and effective, but was open to question both in law and morals. The nominal owner was indebted on paper to the real owner for the purchase price of the stock, and both avoided the payment of any taxes whatever on such stock. They thus eluded a burden which the minority stockholders, with one exception, had to bear; and they could deny the request, so often made by the latter, for a dividend large enough to pay the taxes, without inconvenience to themselves. The taxes averaged substantially 2 per cent. each year on the par value of the stock. They also arranged matters in other respects so that the nonpayment of dividends was not so grievous to them as to the minority stockholders. When Mr. Gleason obtained control, neither he nor Mr. Lacy was a debtor to the bank for any amount; but he soon began making loans to himself, until in less than a year his line of discounts amounted to $119,640.36. It soon fell to $45,960, but raised again until in December it reached $125,475.51. During 1891 and 1892 it ranged from $15,382.52 to $184,325.61, but averaged considerably more than $100,000. At the time of his death, in January, 1893, it was $128,463.50, at which figure it has since been carried for his estate, except that $6,000 was paid thereon September 1, 1893. Of this amount, $30,000 was wholly unsecured, except by the indi-

vidual, unindorsed notes of Mr. Gleason, who, however, was a man of ample means. Of the remainder, over $90,000 was in notes made by three men, who, with perhaps one exception, had not the means to pay them; but they were all indorsed by Mr. Gleason, which made them perfectly good, and they were doubtless all made simply for his accommodation. The bank also carried for Mr. Gleason, and on his indorsement, a loan of between $30,000 and $40,000 to the Porter Manufacturing Company,—a concern in which he was largely interested, but which was insolvent. Loans were also made to Mr. Lacy, ranging from $3,600 on the 1st of January, 1891, to $22,061.30 in January, 1892, but falling a year later to $8,566. The average was from $10,000 to $11,000; a part being the naked paper of Mr. Lacey, which, although it may not have been good prior to Mr. Gleason's death, has undoubtedly been good ever since that event. Mr. Lacy was also paid a salary as cashier largely in excess of the amount paid to his predecessor, who, although of long experience in that capacity, had received but $2,500 a year, except in 1888, when he had $3,000. On the other hand, Mr. Lacy, who had for some years been employed by the bank in a subordinate capacity, at a salary that never exceeded $1,500, was paid by the direction of Mr. Gleason, and with only a pretense of authority from the board of directors, $5,500 for his services as cashier in 1889; in 1890, $6,500; in 1891, $10,500; in 1892, $13,500. In 1893 he became president, and his salary in that capacity was fixed by the board at $5,000. His successor as cashier, who was thoroughly qualified for the position, received $2,500 per year. A son and daughter of Mr. Lacy, both under age at the time, but competent to perform the duties required of them, were paid for their services in the bank as receiving teller and discount clerk, respectively, at the rate of $50 a month each in 1890, $100 a month each after June, 1891, and $200 a month each after April, 1892. The payments were reduced in 1893 to $225 per month for both together. Their respective predecessors had received $87.50 and $66.66 per month. Thus, in four years, Mr. Lacy received $36,000, and his children, during a similar period, $10,650 more, from the bank. Mr. Gleason's salary as president had never exceeded $2,500, while Mr. Hier's was but $2,000. When Mr. Lacy was cashier, Mr. Gleason drew no salary, and none was fixed for him by the directors; but he allowed the cashier to have the sum which he claimed he was entitled to, and this is the reason given for the large salary of Mr. Lacy. In 1892, when Lacy was paid the sum of $13,500, it was charged to several different accounts, instead of to current expenses only, as had always been done before the salaries paid. This action is suggestive, as the current expense account had increased from $6,033.39 for the six months ending June 1, 1889, to $11,345.65 for the six months ending December 1, 1891. These salaries were manifestly excessive, and they have not been satisfactorily explained. They point to an object other than compensation for services rendered, and give support to the theory of the plaintiffs that they were intended in part to take the place of dividends, so as to enable the controlling interest

to punish its opponents without loss. This theory finds further support in the circumstances connected with the increase of the capital stock. In 1890 Messrs. Gleason and Lacy wished to increase the stock from $300,000 to $400,000, and in order to obtain the consent of two-thirds of the stockholders, as required by law, it became necessary to temporarily conciliate the Hiscock interest. Accordingly, Mr. Gleason assured Mr. Hiscock that, if he would consent to the increase, dividends should be resumed, and they might get together again. In reliance upon this statement, Mr. Hiscock, without whom the stock could not have been increased, gave his consent, and took his share of the new stock, the bank lending him the money for the purpose. At the same time, Mr. Lacy told Mr. Tolman that as soon as the increase was made, and the necessary reserve of 20 per cent. accumulated, they would commence making dividends again; and, on the strength of this assurance, Mr. Tolman gave his consent. Dividends, however, were not resumed, although, as admitted by one of the learned counsel for the defendants upon the trial, there never was a time when the bank was not able to declare a dividend.

For some purpose, at variance with the previous history of the bank, Gleason and Lacy soon began to reduce the apparent value of the assets, by charging off good items, and reducing others to a point below their intrinsic value. Thus, the bank had for some time owned government bonds of the par value of $375,000, and in 1891 it increased the holding to $400,000. The premium on these bonds amounted to from $45,000 to $50,000. If retained by the bank, and circulation was taken out upon them, as was in fact done, they would produce enough income to pay 6 per cent. on their face value, and also enable enough of the premium to be charged off each year to completely wipe it out before the bonds matured. Yet all of the premium was charged off in 1890, except $5,000, which followed in 1891. About 1887 the bank erected a convenient and beautiful banking house at a cost somewhat exceeding $80,000, and which is now worth from $60,000 to $70,000. Of this item over $55,000 was charged off on the 18th of February, 1889, and the 17th of May, 1891. March 17, 1893, certain real estate, known as the "Park Block," belonging to the bank, and worth $10,000, was wholly charged off. Omitting other assets of less value, which took the same course, but perhaps with a different purpose, the three mentioned amount to $111,598.44, the whole of which was perfectly good, except as reduced by some deficiency in the price of the banking house. After making a reasonable allowance for this item, there still remains from $90,000 to $100,000 of good assets charged off the books of the bank, or about one-fourth of its capital. Notwithstanding this heavy reduction in the apparent value of its assets, the bank has had a surplus, even upon that basis of value, ranging from $70,000 and upwards to about $115,000. Thus, its actual surplus is about $200,000, or the equivalent of one-half its capital and more, proportionately, than when the bank was paying dividends every year. It is not without significance that the charging off was so timed as to reduce the apparent surplus whenever it

would otherwise have shown a marked increase. Thus, in 1889 there was an apparent loss on the business of the year, according to the books, of $22,195.80, but good assets were charged off to the amount of $30,871.17, so that the actual net profits were $8,675.37. In 1890 the apparent net profits were $1,420.91, but, including good assets charged off, they amounted to $42,148.18. In 1891 the apparent net profits were $17,438.76, but, with good assets charged off, they were more than twice that sum. In 1892, when the salaries to Mr. Lacy and his family ran the highest, there was an apparent net loss of $3,962.84, and no assets were then charged off worth mentioning. In 1893 the apparent net profits were $5,309.30, but the actual net profits, including the good assets charged off, were $15,309.30. During the five years under consideration, the average net profits exceeded 5 per cent. upon the capital, without taking into account the good assets charged off, other than those above mentioned. The effect of the course pursued, as thus outlined, was to so depress the value of the stock as to make it difficult to sell at par, when it is really worth from $140 to $150 per share. Mr. Lacy stated when on the stand as a witness that its present value is $150, and that it would realize upon liquidation $140.

Towards the close of 1892 the physical infirmities of Mr. Gleason became so great that it was apprehended he was rapidly nearing his last days. On December 20, 1892, he made his will, by which, without disposing of any of his property, he simply appointed Mr. Lacy as his executor, with power to sell. At this time he held Lacy's notes, payable on demand, with interest, given for stock taken in the latter's name, to the amount of nearly $200,000. Four days after the will was made, or on December 24, 1892, a new note was given by Lacy in the place of the old notes; and Mr. Gleason gave him back an instrument which allowed him 10 years in which to pay his note, and relieved him from the payment of any interest in the meantime. This gave Mr. Lacy the option of not paying his note until the charter of the bank had expired. Ten days later, or on January 3, 1893, Mr. Gleason died, at the age of 73, and soon after this will was admitted to probate, with Mr. Lacy as sole executor. Some time before the will was made, Mr. Lacy declared that the stock would not be split up among the heirs, but would be so fixed as not to be forced to a sale when Mr. Gleason died. Not long after he became sole executor, when asked by a stockholder to use his influence in favor of paying dividends, Mr. Lacy replied that he was not in favor of it, as he did not think his uncle would be, and he wanted to carry out his wishes. Having the power, he continued the policy of excluding from the board of directors every one connected with the minority interest. In the place of his uncle, he caused a gentleman to be elected director, to whom he sold 10 shares of stock, so that he could accept the position, but exacted an agreement authorizing him to take back the stock at any time upon repayment of the purchase price and interest. The defendant directors were elected in January, 1893, soon after the death of Mr. Gleason; and, with two exceptions, they are the same persons

who acted as directors during his life, after he got control of the bank. Seven out of the nine directors so elected together own but 94 out of the 4,000 shares of stock, and hence have but a small pecuniary interest in the management. The other two directors are said Lacy and Orson Gleason, his uncle, who own, respectively, 1,782 and 113 shares. Mr. Lacy, as executor, also controls 474 shares in addition to those owned by him, as already stated. During 1890, 1891, and 1892, Orson Gleason paid no taxes on his stock; and he is a somewhat heavy, but perfectly responsible, borrower at the bank.

As would naturally be expected from the existing state of affairs, Mr. Lacy is the controlling spirit of the present management, as Mr. Gleason was before him. Few meetings of directors—an average of less than two each year—have been held since they came into supreme control; and at none of them has any business of importance been transacted, except the election of officers, and matters of that character. Even the committee appointed for two years in succession to make a thorough examination into the affairs of the bank has made neither examination nor report. In May, 1893, a meeting was held, upon request of the plaintiffs, at which a formal demand for a dividend was made in their behalf; but the resolution, introduced by one of the directors, to declare a dividend, was laid upon the table, and the demand refused, there being two negative votes. Mr. Lacy said in response to the request for a dividend that he knew it was for the interest of the stockholders to declare one, but that he was opposed to it. Another director, when served with a written demand for a dividend, said, as he read the notice, "Well, they will never get it." The refusal was persisted in until the 25th of November, 1893, when this action was commenced; and down to the close of the trial, in July, 1894, no dividend had been declared, nor any steps taken in that direction. One director, when the summons and complaint was served upon him, said that Senator Hiscock would get his dividend much sooner if he had not brought the action. On a like occasion, another director said that it served the directors right, and that he advised them to declare a dividend at the last meeting. The directors, aside from Lucius Gleason, while he lived, Mr. Lacy, Mr. Marshall, and Mr. Amos, have had little to do, and apparently took but little interest in managing the business of the bank. They were of the opinion that a dividend could safely be declared, and the most of them, upon cross-examination, seemed to think that dividends should be resumed. One testified that for a year or longer prior to the demand he had been in favor of a dividend; another, that he knew of no reason why a dividend, reasonable in amount, should not be paid; two others, that they relied upon the judgment of Gleason and Lacy, and, without any extended examination, acquiesced in their desire that dividends should not be paid; a fifth, that as he went into the directory upon the invitation of Mr. Lacy, and on stock transferred to him by that gentleman for the purpose, he would not sever from him unless he thought he was doing something radically wrong, immoral, or criminal; a sixth said that he trusted to Mr. Gleason's judgment, and voted as he

wanted him to; that he refused to vote upon the resolution of May, 1893; and that he favored a dividend large enough to pay the taxes on the stock. A seventh swore that he presumed he would not have voted against Mr. Gleason's judgment upon any question, that he became a director practically expecting to do what Gleason and Lacy wanted him to in the matter of voting, and that he was in favor of a dividend at the time of testifying. Some, as directors in other banks during the same period, voted in favor of dividends by those banks, although they had less surplus in proportion to capital than the defendant bank. All who spoke upon the subject were of the opinion that it was a source of strength in a bank to pay dividends, as it gave confidence to the community in its resources and management. They all testified that they acted in good faith, and without any intention to injure or oppress the plaintiffs; but it is clear to my mind, from the evidence as a whole, that the directors having small holdings of stock, with one or two exceptions, simply acquiesced in the policy of Gleason and Lacy with reference to the subject of dividends, without being really in favor of it as a matter of deliberate judgment based upon the actual condition of the bank. In the natural course of affairs, acquiescence is to be expected, from a director holding but 10 or 20 shares, in the wishes of a director holding more than 2,000, or an absolute majority over all. Knowing that he was a director by invitation and upon sufferance, he would be a bold man who persisted in opposing the declared policy of one who not only had a much larger interest to protect, but also the power to protect it by selecting directors who would vote as he wanted them to. When one man is so powerful that he is practically the bank, he does not have to give many reasons, nor use persuasive arguments, to secure compliance with his views. He insures acquiescence by his power to compel it. He prevents opposition because he can displace his opponents. With the actual voting power in the board of only one out of nine, he virtually casts all the votes when he wants to, because he elected the nine directors, and can elect nine others in their places. He who can at each annual election continue the directors in office or turn them out, at his pleasure, will seldom ask them to support his policy in vain. In fact, he ordinarily need not ask the support, if he simply announces his policy.

These facts, with others not mentioned, leave no doubt in my mind that Lucius Gleason and Henry Lacy, in adopting and persisting in the policy of paying no dividends, acted without reasonable cause, and in bad faith, for the purpose of punishing the minority interest, and at the same time securing advantages for themselves and their friends which the other stockholders did not enjoy; that their professed object of strengthening the bank was only a pretext to conceal their abuse of power; that it was the object of the will, note, and agreement to enable Lacy to perpetuate such policy after the death of Mr. Gleason; that said policy was continued by him after that event in the same way and for the same purpose; and that a majority of the other directors have, some through carelessness, and others through a sense of obligation or through fear,

acquiesced in such policy, and aided in carrying it into effect by so voting as to express the wishes of Mr. Gleason and Mr. Lacy, rather than their own judgment. Thus, although not guilty of intentional fraud, their conduct had the same effect as fraud, and calls for the same redress.

Such being the facts, the question arises whether there is any remedy for these wrongs. While courts have required business corporations to divide surplus profits, no case is cited where they have ordered a bank to declare a dividend, but no case seems to have arisen before where such facts were presented to a court for its judgment. I approach the subject with caution, realizing its delicacy and importance. In authorizing the formation of business corporations, the law has two objects in view: (1) To make the corporation strong, so that the public can safely deal with it; (2) to permit a reasonable division of its surplus earnings among the stockholders, so as to attract the investment of capital. When the first is accomplished, the second is authorized. The first is effected by certain mandatory provisions, which must be complied with, not only in forming the corporation, but also in the management of its affairs after organization has been perfected. The second object is sought to be attained by certain permissive provisions, under the theory that self-interest will impel the stockholders, through their directors, to secure a proper return upon their investments. The management of a corporation is intrusted to directors, who are elected by the stockholders by the vote of a majority of shares. The directors have a twofold duty to perform,— to obey those provisions of law made to strengthen the corporation for the security of the public, and, as trustees for the stockholders, to promote their interest by the exercise of good faith and honest judgment. The courts will not interfere with the efforts of directors to strengthen a corporation in any way authorized by law, where that is the real object, and not a pretext to conceal an illegal purpose. They will neither require nor permit directors to depart from the regulations of any public officer, made according to laws authorizing him to supervise the affairs of corporations, and they will lend their aid to such officers, in order to make their supervision effective. People v. Ballard, 134 N. Y. 269, 32 N. E. 54. The directors, in the discharge of their duties to the public, are protected only by absolute obedience to the law, even good faith being no excuse for violating the governing statute; but, in the discharge of their duties to the stockholders, good faith is the standard of action. Directors are not required to be wise, but they are required to be honest. Errors of judgment are excused, even if they result in disaster to the stockholders; but bad faith, whether exercised to gratify malice or to promote personal interests, is condemned by the courts, which are zealous to find a remedy for the breach of trust. Jurisdiction is assumed by courts of equity from their right to supervise trusts, and to call trustees to an accounting. The property of private corporations is in the nature of a trust fund, under the control of directors, as trustees, for the benefit first of creditors, and next of stockholders. Strictly speaking, the corpora-

tion holds the property in trust for the creditors and stockholders, and the directors are its agents to discharge the trust. But while the directors may not be technical trustees, because they do not have the legal title to the property, still, as a corporation is a mere idea or legislative fiction, incapable of thinking or acting for itself, and its directors are empowered to think and act for it, they are charged with the duties and responsibilities of actual trustees. 2 Pom. Eq. Jur. §§ 1088, 1097; Potter. Corp. § 330; Taylor v. Railway Co., L. R. 2 Exch. 379; Ervin v. Navigation Co., 27 Fed. 625, 630. Primarily, the corporation has the right, as a beneficiary of an implied trust, to call the directors to account; but, as this is not practicable while the same persons continue directors, the stockholders may commence the action in their own names, on making the corporation a party defendant. While all the decisions hold that the general powers of a corporation reside in its directors, and that the ordinary power of the stockholders is confined to the choice of directors, they all proceed upon the theory that the directors, as trustees, must act in good faith, and unless they do so the courts will restrain or compel action in the interest of the aggrieved stockholders as justice may require. Thus, directors have been restrained, upon the application of stockholders, from misapplying funds (Carpenter v. Railroad Co., 5 Abb. Pr. 277); from so violating the charter as to hazard its forfeiture (Kendall v. Palace Co., 4 Kay & J. 326); from transferring property with intent to injure a stockholder (Kelly v. Mining Co., 4 Hun, 632); from unfairly discriminating between stockholders, so as to give one an advantage over the other (Luling v. Insurance Co., 45 Barb. 510); from so contracting with themselves, in the name of the corporation, as to secure an undue advantage at its expense (Wardell v. Railroad Co., 103 U. S. 651, 658); from obtaining a valuable and exclusive privilege through their control over the corporation (Koehler v. Iron Co., 2 Black, 715, 720).

The courts have not only restrained directors from performing unauthorized acts, but they have also awarded affirmative relief, by compelling the performance of acts required by good faith to the stockholders. Thus, they have compelled directors to perform a duty imposed by statute (People v. Cummings, 72 N. Y. 433); to defend against unfounded and illegal claims (Bronson v. Railroad Co., 2 Wall. 283, 302); to resist the collection of a tax which the directors themselves believed was imposed in violation of law (Dodge v. Woolsey, 18 How. 381); to declare a dividend where the surplus warranted it, and the by-laws provided for it (Belfast & M. L. R. Co. v. City of Belfast, 77 Me. 445, 454, 1 Atl. 362); to declare a dividend where the right was not only clear, but fixed by contract (Boardman v. Railroad Co., 84 N. Y. 157); to pay over to a stockholder his share of corporate moneys that have been misapplied, but which ought to have been divided as dividends (Brown v. Railroad Co., 27 Hun, 342; Richardson v. Railroad Co., 44 Vt. 613; Dent v. Tramways Co., L. R. 16 Ch. Div. 344). The sanction of the courts to precisely such an action as the one under consideration has thus far been by intimation, rather than decision. Thus, in Scott v.

Fire Co., 7 Paige, 198, 203, it was said that if the directors of an in-
surance company should, "without reasonable cause, refuse to divide
what is actually surplus profits, the stockholders are not without
remedy, if they apply to the proper tribunal." While this was not
necessary in order to decide the case then in hand, it has been re-
ferred to with approval by many courts of last resort, and has been
criticised by none to which my attention has been called. In
Seeley v. Bank, 78 N. Y. 608, 8 Daly, 400 it was held that where a
national bank reduces its capital under the statute the whole of the
capital set free by the reduction must be returned to the stock-
holders, and that no portion of it can be retained as a surplus fund,
or for other purposes. In Williams v. Telegraph Co., 93 N. Y. 162,
192, the court said, "When a corporation has a surplus, whether a
dividend shall be made, and, if made, how much it shall be, and
when and where it shall be payable, rest in the fair and honest
discretion of the directors, uncontrollable by the courts." If the
discretion is not fairly or honestly exercised, the inference is that
the courts should interpose in behalf of the injured stockholder. In
McNab v. Manufacturing Co., 62 Hun, 18, 16 N. Y. Supp. 448, it
was held "that the rate of dividend to be paid, and the amount of
surplus to be retained, by a corporation, must rest in the fair and
honest discretion of its trustees." In that case there was no
reason for doubting or impeaching the good faith of the trustees,
and there was no occasion for interference, but the principle that
good faith is required was recognized. In Brown v. Railroad Co.,
27 Hun, 342, the plaintiff, a stockholder suing in behalf of himself
and all other stockholders willing to unite, alleged that the corpora-
tion and its president had converted and misapplied corporate
moneys, and refused to account for the same; that they had with-
held dividends, and kept false books of account,—and demanded
that they account for and pay over to him his share of said moneys,
which ought to have been divided in the form of dividends among
the stockholders. The demurrer interposed by the corporation,
that the complaint did not state a cause of action, was overruled.
This case, especially when the original complaint is examined, bears
a strong analogy to the case under consideration. 1 Sup. Ct. Cas.
1880 (4th Dept.). An instructive case was recently decided by the
court of last resort in Michigan. It appeared that for seven years
a stockholder, who owned a majority of the stock, elected himself
and two of his dummies as directors, and caused the board to vote a
large salary to him as president. By reason of this and other acts
of like chaarcter, the corporation failed to pay dividends; and upon
the suit of a minority stockholder the court took the management
away from the directors altogether, appointed a receiver, and dis-
solved the corporation. Miner v. Ice Co., 93 Mich. 97, 53 N. W. 218.
In Fougeray v. Cord (N. J. Ch.) 24 Atl. 499, a corporation with but
three stockholders was controlled by two of them, who voted large
salaries to themselves, and refused to declare dividends, although
there was a good surplus. The court not only ordered a dividend,
but intimated a division of all the assets might be ordered on ac-
court of the fraudulent management. The action of the federal

courts in dealing with a tyrannous majority of stockholders in disregard of the rights of the minority may be seen in the following cases:    Sellers v. Iron Co., 13 Fed. 20; Davis v. Railway Co., 22 Fed. 883.    The elementary writers all agree that stockholders have a remedy, if the directors do not act in good faith in refusing to declare a dividend.    Thus, in Waterman on Corporations, it is said:

"The managers of a corporation are clothed with a large discretion with reference to the declaration of dividends. They may be compelled to exercise their discretion if they improperly fail or refuse to do so. But, when they have exercised it without any violation of the charter, their action cannot be disregarded or controlled by a court at the instance of a stockholder, unless it is shown to have been an abuse of their discretion, or the result of bad faith, or a willful neglect or breach of duty. * * * Should they, without reasonable cause, refuse to divide what is actually surplus profits, the stockholders are not without a remedy." 2 Wat. Corp. 148–150. "The doctrine that where a corporation is about to exceed its powers, by applying its property to objects beyond the authority of its charter, a court of equity will grant relief to a minority of its stockholders, who dissent from such use of its funds, necessarily results from the principle that the corporation and its directors are trustees, and as such may be called into a court of equity, either for an account, or to restrain them from mismanagement of the corporate property, especially for a fraudulent mismanagement of it, or for the purpose of compelling the corporation to declare dividends from its surplus earnings, when such dividends are needlessly and improperly withheld." Id. 154.

"The discretion of the directors in the matter of declaring or refusing to declare a dividend is not absolute. The courts exercise a supervisory power in this matter; and, where there is a clear abuse of power in refusing to declare a dividend, a court of equity will, at the instance of any shareholder, compel the proper authorities to declare and pay the dividend." Cook, Stock, Stockh. & Corp. Law, § 545.

"If a majority of the stockholders or directors of a corporation wrongfully refuse to declare a dividend and distribute profits earned by the company, any shareholder feeling aggrieved may obtain relief in a court of equity." 1 Mor. Corp. § 448 et seq.

"While a right to a dividend is no debt until the dividend is declared, the stockholders are not remediless in case the directors, without reasonable cause, refuse to divide the surplus profits. They may be compelled in such cases to make the distribution." 2 Beach, Corp. § 602.

"Should the directors act illegally, wantonly, or oppressively, and willfully abuse their discretion, in refusing to declare a dividend, where the right to one is clear, and there are funds from which it can properly be made, a court of equity will compel the directors or trustees to declare and pay such a dividend as the funds accumulated will warrant." Kerr, Bus. Corp. 189.

See, also, Ang. & A. Corp. §§ 391–393; Potter, Corp. 100; Spel. Priv. Corp. 441, 442; Pierce, R. R. 122; Smith v. Manufacturing Co., 29 Ala. 503, 508; Park v. Locomotive Works, 40 N. J. Eq. 114, 118; March v. Railroad Co., 43 N. H. 515; Taylor v. Exporting Co., 5 Ohio, 165; Pratt v. Pratt, 33 Conn. 446, 456; Beers v. Spring Co., 42 Conn. 17–27; Belfast & M. L. R. Co. v. City of Belfast, 77 Me. 445, 454, 1 Atl. 362; Hazeltine v. Railroad Co., 79 Me. 411, 10 Atl. 328; Hunter v. Roberts, Throp & Co., 83 Mich. 71, 47 N. W. 131; Ely v. Sprague, Clarke, Ch. 351; Richardson v. Railroad Co., 44 Vt. 613; State v. Bank of Louisiana, 6 La. 745, 763; Barnard v. Railroad Co., 7 Allen, 512, 521.

From the authorities cited the rule may fairly be drawn that where, without doubt, the surplus of a corporation properly appli-

cable to a dividend is ample for the purpose, and the directors, or a majority of them, acting in bad faith and without reasonable cause, refuse to declare a dividend, the courts will interpose in favor of those stockholders who otherwise would be without remedy. Such is the case now before the court, and it follows that the plaintiffs are entitled to a decree requiring the defendants to declare a reasonable dividend, provided the practice pursued is regular.

The learned counsel for the defendants, in his able argument, insisted that the complaint should be dismissed because the plaintiffs sue in their own behalf only, and not also in behalf of all other stockholders who might come in and unite in the action. As this objection, however, was raised neither by answer nor demurrer, it has been waived. Code Civ. Proc. §§ 488, 498, 499; Tremper v. Conklin, 44 Barb. 456, 44 N. Y. 58; Merritt v. Walsh, 32 N. Y. 685.

It is also suggested that, as a national bank is the creature of the federal government, it is not within the jurisdiction of a state court to interfere with the internal affairs of such a corporation. This would, perhaps, be the rule, had not congress provided otherwise. Osborn v. Bank, 9 Wheat. 738. Any doubt as to jurisdiction, however, is dispelled by a reference to the statutes of the United States, one of which provides "that the jurisdiction for suits hereafter brought by or against any association established under any law providing for national banking associations, except suits between them and the United States, or its officers and agents, shall be the same as and not other than the jurisdiction for suits by or against banks not organized under any law of the United States which do or might do banking business where such national banking associations may be doing business when such suits may be begun; and all laws, and parts of laws, of the United States inconsistent with this proviso be, and the same are hereby repealed." U. S. Stat. 1882, c. 290, § 4. A later act provides "that all national banking associations established under the laws of the United States shall, for the purposes of all actions by or against them, real, personal or mixed, and all suits in equity, be deemed citizens of the states in which they are respectively located, and in such cases the circuit and district courts shall not have jurisdiction other than such as they would have in cases between individual citizens of the same state." St. U. S. 1888, c. 866, § 4; Bank v. Cooper, 120 U. S. 778, 781, 7 Sup. Ct. 777; Petri v. Bank, 142 U. S. 644, 649, 12 Sup. Ct. 325.

The only questions remaining relate to the amount of the dividend to be declared, and the costs of the action. After careful reflection, I have reached the conclusion that the bank should pay a dividend of not less than 12 per cent., leaving it to the discretion of the directors to increase the amount, if they think best. The bank can readily pay a larger dividend, but I wish to be on the safe side, and to make a conservative decision. This is but little, if any, more than enough to pay the taxes assessed upon the stock during the period that dividends have been suspended. The decree to be entered may provide for payment of one-half the amount within 60 and the other half within 90 days after entry of judgment,

with leave to the directors to pay the whole at an earlier date if they prefer.   The plaintiffs should recover costs, but, owing to the facts already stated, they should all be paid by Henry Lacy.   Findings and a decree may be prepared accordingly, and served, with a copy of this opinion, on the attorneys for the defendants; and, if not agreed upon as to form, they may be settled before me on a notice of two days.   Ordered accordingly.