FARMERS' LOAN AND TRUST COMPANY, as Substituted Trustee
under the Will of HERBERT L. PIERSON, Deceased, Plaintiff,
*v.* JOHN FREDERICK PIERSON and Others, Defendants.

Supreme Court, New York County, May 14, 1927.

**Trusts — accounting — defendant trustees, upon decedent's death,
received stock of corporation under terms of will by which children
were made beneficiaries — trustees elected themselves·directors of cor-
poration and have accounted but once in thirty-three years — bene-
ficiaries are entitled to full accounting of management of corporation
— determination in prior action, as to compelling defendants to account
in full, not res judicata where infant children were not parties.**

Defendant trustees, upon decedent's death approximately thirty-three years ago,
received under the terms of his will, 400 shares of stock of a corporation in trust
for the benefit of decedent's children. The trustees having elected themselves
directors of the corporation, made conveyances of lands and otherwise affirma-
tively managed the affairs of the corporation, and only once in thirty-three
years submitted an accounting of their activities. In this action, to compel a
full accounting of their management of the actual property of the corporation,
the beneficiaries of the trust are entitled to learn from the trustees, to a reason-
able extent, all facts concerning the management of the corporation.

Defendants' claim, that by reason of their directorship in the corporation their
accountability is limited to their bare custody of the stock and a narration of
the dividends received, is unwarranted, since such a position would interfere
with decedent's declared purpose to have his property cared for after his death
by trustees for the benefit of certain named beneficiaries in keeping with the
ordinary rules relating to trusts.

The fact that a special master, in an action in the U. S. District Court, was
sustained in a ruling that the trustees cannot be compelled to give any account
of the affairs of a corporation beyond stating that they own 400 shares of stock
thereof, is not *res judicata* as to this action, since two infant children of a party
defendant herein were not parties to the action in which the ruling was made.

The contention of the trustees, that the limitations on their powers as directors
implied in the testator's direction in his will that no property of the company
be sold without the consent of the beneficiaries of the trust is illegal and
unenforceable as against public policy, cannot be sustained.

ACTION by substituted trustee involving its duty under a testa-
mentary trust.

*Geller, Rolston & Blanc,* for Farmers' Loan and Trust Company.

*Miller & Warner,* for John Frederick Pierson, Thomas H. Pierson
and William Pierson Hamilton.

*C. Walter Artz,* for Mrs. Marie Hamilton Swan.

*Reeves & Todd,* for Mrs. Julia Pierson Mapes.

*Albert Ottinger, Attorney-General,* for the State.

*Edward J. Kelly,* substituted for *Curtis A. Peters,* upon his election to the Supreme Court, guardian *ad litem* for Herbert Pierson Mapes and Henry Jeffrey Mapes.

BIJUR, J. Plaintiff submits its account as substituted trustee of a separate fund under the will of Henry L. Pierson, deceased, and asks for instructions with respect to the extent of its duty to make repairs. As counsel are substantially in agreement concerning this matter, I have answered these questions in the findings of fact and no further discussion is necessary. The answers of some or all of the defendants, however, render necessary a construction of other clauses of the will.

The decedent owned all of the shares of the Ramapo Manufacturing Company, incorporated under a " public act " of the Legislature (Laws of 1822, chap. 5), with a share capital of $400,000, divided into 400 shares of $1,000 each. The purpose of the corporation was " carrying on the business of manufacturing iron, nails, cotton goods, and other articles." The company actually took over some 6,000 acres of land, together with a few manufacturing establishments situated thereon, and belonging at that time to two members of the Pierson family mentioned in the charter.

By the 7th clause of the will the testator left to his executors " all my stock in the Ramapo Manufacturing Company, and all my right, title and interest in the property of said company, real and personal, including herein the property in the towns of Passaic and Hohokus, New Jersey, standing in my name, but belonging to said company. In trust, during the life of the longest liver of my two children, John Frederick and Julia, to manage and preserve the said property and to pay over quarterly whatever income shall be derived therefrom, above the expenses of managing and preserving said property in equal shares to my seven children (or their issue) * * * and upon the death of the longest liver * * * to divide the whole of said property or the proceeds thereof into as many equal shares as there shall be children of mine, issue of whom shall then be living, and to transfer and pay over one of such shares to each one of my children then living, and one to the issue then living of each deceased child of mine.

" The trustees shall vote upon said stocks at any meeting of said company. I give to the trustees full power and authority to sell, from time to time, at public or private sale, any part or the whole of the property of said company, * * * but I direct that no sale of any real estate of said company shall be made by the trustees without the consent of all of them, then acting as such trustees, and the consent of at least a majority of my children not trustees who shall be living at the time of any proposed sale. In the event

of any such sale, the trustees shall divide and distribute the proceeds of sale among my children then living and the issue then living of any deceased child of mine, in the manner hereinbefore directed, for the division of the whole trust property upon the termination of the trust."

At the time of testator's death, thirty-three years ago, the executors received the stock. They or their successors have since held it as trustees. As such stockholders they elected themselves and certain subordinate persons directors of the company. Only one accounting has been submitted, *i. e.*, in 1916 in a suit in the United States District Court, Southern District of New York. Therein the trustees charged themselves with the possession of the 400 shares of stock, but declined to give any account of the affairs of the Ramapo Manufacturing Company. In that suit the special master ruled, and was sustained, that no more extended accounting could be compelled.

In the present action the trustees tender an account in the same form, and plead *res adjudicata* as to this issue. The plea is bad, among other possible reasons, because the two infant children of the defendant Mrs. Mapes were not made parties to the previous action. Both are vested remaindermen under the will. (*Moore* v. *Littel*, 41 N. Y. 66.) Herbert P. Mapes was born April 3, 1907. The judgment was entered in the Federal suit on January 23, 1916. Henry J. Mapes was born July 20, 1916.

It may be argued that Henry is bound by the previous judgment, as a privy by blood to his mother, but a child *en ventre sa mère* when the inheritance of property is involved is considered born, provided such a holding is for its advantage. (See *Villar* v. *Gilbey*, L. R. [1907] App. Cas. 139; Decedent Estate Law, § 93.)

At all events there can be no question but that the presence here of Herbert P. Mapes alone is sufficient to defeat the plea. " A child as a vested remainderman is not in privity with his parent as life tenant." (See Freeman Judgments [5th ed.], §§ 481, 490; *Matter of Simpson*, 253 Penn. St. 217; *Brewer* v. *Hardy*, 22 Pick. [Mass.] 376.) The objections of the guardian *ad litem* must, therefore, be considered.

Since 1916 there have been two conveyances of land to the trustees individually or their nominees, the proceeds of which have been distributed among the beneficiaries. Part of the land has been rented to a company in which relatives of the trustees are interested. There is no charge of fraud before me. The question is presented whether the beneficiaries under the will are entitled to a full accounting of the trustees' management of the actual property, or whether they must be satisfied with a bare statement that the trustees hold 400 shares of stock and have received such and such dividends.

The trustees make a further contention that the limitation in the will upon their right to sell property of the corporation, which requires the consent of the beneficiaries of the trust, and the direction that they shall distribute the proceeds of any sale among the beneficiaries, are invalid as unlawful restrictions upon their powers and duties as directors of the corporation.

As to the extent of the accounting: The trustees offer as their reason for declining to follow the ordinary course of trustees — namely, the giving of a full account of their substantive acts — the existence of this corporation. They undertake to limit their accountability in the premises to their bare custody of the stock and a narration of the dividends received. It is easy to say that their trusteeship entails the duty to account for their acts as directors, a position which they occupy by virtue of their trusteeship. The weakness of the answer, however, lies in the fact that it begs the question, and is a bare statement of a conclusion, acceptable or not according to the preconceived notions of the hearer. It proceeds on an impression or a generalization, rather than on a demonstration which affords a working rule. I have, therefore, felt it necessary to make a more thorough analysis, in the hope of finding a solution based upon recognized principles.

Moreover, the United States District Court has on the report of the special master approved of the trustees' contention. A reference to that report indicates either that petitioner there failed to make the claim that is now made, or else that her claim was misunderstood by the learned special master. He says in substance that directors of a corporation have discretion to determine what dividends shall be declared, and that no stockholders have the right to call for an accounting as to the management of the corporate affairs on the sole ground that they have not declared dividends. (Citing *Matter of Kernochan*, 104 N. Y. 618; *Beveridge* v. *New York El. R. R. Co.*, 112 id. 1; *Gibbons* v. *Mahon*, 136 U. S. 549.) Whether that view, as stated, is sustainable in the light of *Hiscock* v. *Lacy* (9 Misc. 573), cited in *Bosworth* v. *Allen* (168 N. Y. 157); *Scott* v. *Eagle Fire Co.* (7 Paige, 198, 203) and *Dodge* v. *Ford Motor Co.* (204 Mich. 459), it is idle to consider, because no such claim is advanced now.

As I understand it, the beneficiaries are urging now solely that they are entitled to know from the trustees, to a reasonable extent, all facts concerning the management of the company which is being conducted by the trustees under their title as directors. The learned counsel for the trustees urges that the integral nature of a corporation is at issue. His citation of *Button* v. *Hoffman* (61 Wis. 20) is prefaced with the statement that this is the leading case on the distinction between " the juristic personality of a corporation and

its stockholders." Although the argument cannot be summed up in a line, and although perhaps it is not accurately framed, its general purport is that in some way, through the existence of the corporation, an obstacle is interposed between the trusteeship and the corporate directorate — that there is a " veil " or a " shield " of a corporate " entity " to be " pierced " before the trustees can be compelled to account to the *cestuis que trust* for the affairs or management of the corporation.

The organic nature of a corporation has been the subject of discussion among juristic writers for years. A continental school, headed by George Beseler and Otto Gierke in Germany, and counting among its followers Maitland, Pollock and Geldart in England, insists that a corporation has something akin to a human personality, with a corporate will additional to and identifiable from the separate wills of the corporators. (Gierke's Das Deutsche Genossenschaffts-recht; Pollock's Essays in the Law, 151; Geldart Legal Personality, 27 L. Q. Rev. 90; Maitland Introduction to his partial translation of Giercke's work. See, also, Sir Ernest Barker's summation of the personality doctrine in his Political Thought in England, 177; Dewey's Historic Background of Corporate Legal Personality, 35 Yale Law Jour. 655.)

There has been a striking absence of consideration of this doctrine in Anglo-American jurisprudence (Machen, Corporate Personality, 24 Harv. Law Rev. 253, 347), and Maitland himself concedes that it has been practically disregarded there. The tendency with us has been to accept what is commonly called the " fiction," perhaps sometimes the " concession," theory of the corporate form, although I am by no means sure that their respective advocates always use these terms interchangeably. Its first formulation in England is attributed to Lord Coke, who said in the case of *Sutton's Hospital* (10 Coke, 1, 32 [1613]): " A corporation aggregate of many is invisible, immortal, and rests only in intendment and consideration of the law."

Blackstone, in the 18th chapter of Book 1 of his Commentaries, calls corporations " artificial persons," and adds: " With us in England the king's consent is absolutely necessary to the erection of any corporations."

In *Bank of United States* v. *Deveaux* (5 Cranch, 61, 86, 88) Chief Justice MARSHALL speaks of a corporation as " that invisible, intangible, and artificial being, that mere legal entity * * *. It is defined [in England] as a mere creature of the law, invisible, intangible, and incorporeal."

Whatever the value of the personality doctrine juristically or in relation to concepts of the sovereignty of the State (see Laski, The

Personality of Associations, 29 Harv. Law Rev. 404), American jurisprudence has proceeded along the line of treating a corporation as an artificial creation deriving its powers, express or implied, from the State.    Professor Gray, in his characteristic common-sense way has said (Nature and Sources of the Law, 52): " Whether a corporation is a real or only a fictitious entity is a question which I shall not undertake to solve.    *    *    *    According to an old saying, everybody is born either a nominalist or a realist."

It is quite natural that for purposes of facile expression we should personify the corporation and speak of it as a fictitious, or perhaps more accurately as an artificial, *person.*    The complex of activities involved in the administration of the affairs of a decedent is commonly entitled the " estate; " a " partnership " is the ordinary appellation of the businesss of one or more persons standing in that relation, although it is the personal representatives of the decedent and the individual partners with whom the law deals.

Early in our judicial history the courts felt the need of ascribing some degree of personification to a corporation, in order to assign to it an appropriate place in our system of jurisprudence.    Thus the Federal courts were much vexed with questions of residence and citizenship on the part of corporations within the express terms of a written constitution designed primarily to apply to human beings. (*Bank of United States* v. *Deveaux,* 5 Cranch, 61; *Louisville, C. & C. R. R. Co.* v. *Letson,* 2 How. [U. S.] 497; *Paul* v. *Virginia,* 8 Wall. 168; *Bank of Augusta* v. *Earle,* 13 Pet. 519; *Santa Clara County* v. *Southern Pacific R. R. Co.,* 118 U. S. 394; *Southern R. Co.* v. *Greene,* 216 id. 400.)    An echo of this controversy is to be found in England in *Daimler Co.* v. *Continental Tyre & Rubber Co.* (L. R. [1916] 2 App. Cas. 307).

The answer to these problems represents the recognition of a complex of considerations — legal, philosophical, political and utilitarian, In no department of corporation law will there be found a more striking illustration of the aptness of Professor Gray's posing of the difficulty: " How is this state of things to be brought within the scheme of rights and duties upon which the superstructure of the law rests? "

In *Bank of United States* v. *Deveaux* (*supra*) Chief Justice MARSHALL says: " For the general purposes and objects of a law, this invisible, incorporeal creature of the law may be considered as having corporeal qualities."

The specter will not down, as witness the constant recurrence of the question when, where and how a corporation is held to be " doing business."    It is difficult to square the conception of its faculties with the attributes of a concrete person.

When, however, we leave the field of definition or description of

the nature or character of a corporation, and deal with its activities or its external relations, courts have come to regard them from what Professor Roscoe Pound has termed the functional standpoint. The services performed for trade and commerce by this peculiar form of organization are recognized as including the elements of limited liability, continuous succession, unified management, power to sue and be sued, and to take or convey property in the corporate name. (Machen, 24 Harv. Law Rev. 325, 356.) Among these purposes particular stress is laid upon the factor of the limited liability of the shareholders. "Philosophy may have gained by the attempts in recent years to look through the fiction to the fact and to generalize corporations, partnerships and other groups into a single conception. But to generalize is to omit, and in this instance to omit one characteristic of the complete corporation, as called into being under modern statutes, that is most important in business and law. A leading purpose of such statutes and of those who act under them is to interpose a nonconductor, through which in matters of contract it is impossible to see the men behind." (HOLMES, J., in *Donnell* v. *Herring-Hall-Marvin Safe Co.*, 208 U. S. 267, 273.) (See, also, Dr. Eliot's Chicago Address, March 10, 1906, in 1 Cook on Corporations [8th ed.] 44, note; Ballantine, Separate Entity of Parent and Subsidiary Corporations, 14 Cal. Law Rev. 12, 19.)

A definite trend has set in to deal with the corporation and interpret its rights and liabilities with a view to effectuate these purposes. "A growing tendency is therefore exhibited in the courts to look beyond the corporate form to the purpose of it and to the officers who are identified with that purpose." (*McCaskill Co.* v. *United States*, 216 U. S. 504, 515; 9 Holdsworth, History of English Law, 70; Vinogradoff, Juridical Persons, 24 Col. Law Rev. 594, 604; BUCKLEY, L. J., in *Continental Tyre Co.* v. *Daimler Co.*, L. R. [1915] 1 K. B. 893, 918.)

I venture to quote also the pointed words of a writer (Erland O. Erickson) in 13 California Law Review, 235: "As the separate personality of the corporation is a statutory privilege, it must be used for legitimate business purposes and must not be perverted."

Courts will disregard the distinct corporate capacity "when it is urged for an intent or purpose not within its reason and policy."

The progress of the corporation through the various stages of our jurisprudence and its pre-eminent part in the development of our trade and commerce naturally led to its being regarded as an institution in our business life, as "a very real *thing*." (Salmond Jurisprudence [7th ed.], 342.) What more natural, then, that when it came to an endeavor to gather from the decided cases instances in which the corporate separateness was strictly recognized and those in which it was apparently disregarded, Professor Wormser

should have entitled his well-known article in 12 Columbia Law Review, 496, " Piercing the Veil of Corporate Entity." He credits part of the title to WILLIAMS, Ch. J., in *Fairfield County Turnpike Co.* v. *Thorp* (13 Conn. 173, 179): " There are cases, however, in which courts have drawn aside the veil."

This attractive and metaphorical designation for a digest of and commentary upon selected cases was not slow to call forth protest, as though it had been intended for an accurate description of a process of juristic reasoning. Ballantine (*supra*) in 1925, and much earlier Professor Canfield, in 1917 (17 Col. Law Rev. 128), undertook to demonstrate that the phrases " ignoring the corporate fiction," " looking at the substance rather than the form," and " a disregard of the corporate entity " were not accurate statements of the effect of the decisions, but that in large measure the latter could be gathered under the classical categories of the activities of courts, to prevent fraud upon creditors, the evasion of an existing obligation, the circumventing of statutes, the achieving or perfecting of a monopoly, or, generally, the perpetrating of knavery or crime. (See, also, 19 Am. Law Rev. 114.)

In fact, most of the civil cases in which it has been sought to " pierce the veil " of the corporate entity have been those in which the attempt was made to hold the stockholders on what appeared to be a corporate liability, or, conversely, to hold the corporation for acts of all the stockholders. Differences between courts on this subject, where the matter did not turn on questions of common fraud, are due largely to divergence of opinion on the general policy of permitting a single stockholding interest to avoid liability by an incorporation made without fraud or misrepresentation. A notable example of the view that the single stockholder was immune is *Salomon* v. |*Salomon & Co.* (L. R. [1897] App. Cas. 22). (See, also, *Elenkrieg* v. *Siebrecht,* 238 N. Y. 254; *Conley* v. *Mathieson Alkali Works,* 190 U. S. 406, 409; *Matter of Goetz,* 236 Penn. St. 630; *Button* v. *Hoffman,* 61 Wis. 20.) The contrary view obtains in a number of jurisdictions. (*Swift* v. *Smith, Dixon & Co.,* 65 Md. 428; *Bauernschmidt* v. *Bauernschmidt,* 101 id. 148; *First Nat. Bank of Gadsden* v. *Winchester,* 119 Ala. 168; *Wenban* v. *Hewlett,* 193 Cal. 675; *Gamer Paper Co.* v. *Tuscany,* [Tex. Civ. App.] 264 S. W. 132.)

Somewhat related to this subject are cases which under appropriate circumstances and upon sufficient evidence hold one corporation as the principal of another which is treated as its agent, notwithstanding the plea of the holding corporation that it is merely enjoying its privilege of owning all the stock of a subsidiary. (See *Berkey* v. *Third Ave. R. Co.,* 244 N. Y. 84, and cases there cited; also *Cannon Mfg. Co.* v. *Cudahy Co.,* 267 U. S. 333.)

Unsuccessful attempts to inject the plea of the corporate form into cases ruled by a consideration of rights that were wholly outside the corporate relation are *Ritchie* v. *McMullen* (C. C. A.) (79 Fed. 522) and *General Rubber Co.* v. *Benedict* (215 N. Y. 18, 21). In a case of this character one quite similar in many respects to the case at bar (*Matter of Jenkins*, 4 States Rep. New South Wales, 625) on an accounting in probate, it developed that one trustee was a member and director of an incorporated real estate agent. WALKER, J., held that the trustees should not be credited with a payment made to the agent for services rendered, and wrote that cases like *Salomon* v. *Salomon & Co.* [1897] (App. Cas. 22), were decided *alio intuitu,* and in no way conflict with the equitable rule that a trustee shall not be allowed to make a profit out of his trust. He said " the question I have now to determine is not, as it seems to me, a question of the meaning of letters patent or Acts of Parliament, but of the extent and operation of a rule which is the creature of Courts of Equity." To the same effect is *Wendt* v. *Fischer* (243 N. Y. 439).

My conclusion from the foregoing review is that the law has neither a " personality " nor an " entity " to deal with, and that there is no " veil." These terms are useful as metaphors or figures of speech to meet a common need in discussing the legal principles involved. As explaining their use, Miraglia says in his Comparative Legal Philosophy (p. 364): " Private law cannot consider any other subject than a real person."

Tourtoulon, in his Philosophy in the Development of Law (p. 391) says: " A fiction, be it understood, is only a juridical ' construction ' like any other. It represents the law both good and bad, but has no claim to create law. To try to make strict and logical deductions from it is nonsense." To the same effect, Kohler, Philosophy of Law (67, 68).

Laying, then, these figures or fictions or other convenient instruments of thought aside, I take two very useful and concrete expressions of the true character and legal significance of a corporation from two wholly different sources: Woodrow Wilson, in an address delivered before the American Bar Association at Chattanooga, Tenn., in 1910 (35 Am. Bar Assn. Rep. 426, 433), said: "A corporation is merely a convenient instrument of business and we may regulate its use as we please and those who use it."

While Professor Hohfeld, in his Fundamental Legal Conceptions (pp. 189, 199) expresses the suggestive thought that it has always been recognized that " transacting business under the forms, methods, and procedure pertaining to so-called corporations is simply another mode by which *individuals* or *natural persons* can

enjoy their property and engage in business," and that "when * * * we speak of the corporation * * * contracting in the corporate name, etc., we are merely employing a short and convenient mode of describing the complex and peculiar process by which the benefits and burdens of the corporate members are worked out."

The concrete import of these views is that a corporation is more nearly a method than a thing, and that the law in dealing with a corporation has no need of defining it as a person or an entity, or even as an embodiment of functions, rights and duties, but may treat it as a name for a useful and usual collection of jural relations, each one of which must in every instance be ascertained, analyzed and assigned to its appropriate place according to the circumstances of the particular case, having due regard to the purposes to be achieved. A confirmation of the accuracy of this analysis of the corporate form is found in the fact that the word " corporation " has a variable, not a constant, meaning.

The rights and obligations that are comprised within the compass of the word change not only with time, but with locality. Limited liability of the shareholders is a comparatively recent invention. Limited and unlimited liability existed side by side, even within this State, under chapter 611 of the Laws of 1875. The extent of limited liability varies under different statutes. Corporations with no par stock are now quite common. Methods of transacting business, conditions under which dividends may be declared, and all the details of what are commonly known as corporate activity are actually different in different jurisdictions. Moreover, endless variants of those features may be conceived of without doing violence to the general designation " corporation." Indeed, the charter of the Ramapo Manufacturing Company itself — the corporation here under consideration — affords a striking illustration of the variants of powers, liabilities and duties which may be properly included in the corporate form.

I come, then, to ask the significance of the particular claim made before me by these trustees who wish it decreed that in their accounting they stop at the point where they have become directors of a corporation. I lay aside for the moment the fact of the identity of persons, although it is not, I think, to be wholly disregarded in the final outcome. What meaning has their statement that they are directors of a corporation? Is this directorate a form of immunity? Is this position something within a " veil? " It seems to me that no one of the purposes or functions legitimately included in the general scope of incorporation has any relevancy to an accounting by these trustees. If the testator considered it

useful or convenient to avail himself of any corporate faculties in the conduct of his business, I see no reason why that consideration should be allowed to interfere with his declared purpose to have his property cared for after his death by trustees for the benefit of certain named beneficiaries according to the ordinary rules relating to trusts.

Perhaps these trustees are under a misapprehension that the mere fact that they are directors of a corporation deprives them of the right or even forbids them to tell the affairs of the company to the real stockholders, their beneficiaries under the trust. But stockholders are entitled to know all about the affairs of their corporation. There are, of course, utilitarian considerations and pragmatic reasons why the directors of a corporation cannot devote their entire lives to an uninterrupted narration to separate stockholders of the minute details of the affairs of their corporation. Practical difficulties involved in such situations are readily solved by the courts through the application of ordinary common sense. But the right of the stockholders to know about their own business — for they are the real owners — can hardly be questioned. (*Matter of Steinway*, 159 N. Y. 250; *Guthrie* v. *Harkness*, 199 U. S. 148; *Klotz* v. *Pan-American Match Co.*, 221 Mass. 38; *Matter of Wygant*, 101 Misc. 509; *Sage* v. *Culver*, 147 N. Y. 241, 247; *Otis-Hidden Co.* v. *Scheirich*, 187 Ky. 423; *People ex rel. Manice* v. *Powell*, 201 N. Y. 194, 201; *Matter of Fitch*, 160 id. 87, 95; *Hale* v. *Mason*, Id. 561.) The directors occupy a very real and broad fiduciary relation to the stockholders. (*Strong* v. *Repide*, 213 U. S. 419, 431; *Bosworth* v. *Allen*, 168 N. Y. 157.)

Be it understood that this is not a case where stockholders or others situated like *cestuis que trust* desire to bring an action for the recovery of money or property against fiduciaries who have been derelict in their duty toward the corpus of the trust, whether in the form of a corporation or otherwise. Naturally, in such an action there must be allegations of wrongdoing, otherwise the action itself would be baseless. There is here a tendency to confound the two meanings of accounting: (1) That of merely informing the *cestui que trust* of all things which he is entitled to know; (2) actually responding to such liability as may be incurred by the fiduciary in the management of the trust. In this case the beneficiaries desire only information, and since the trust includes, not only theoretically, but actually and practically, the management of the corporate affairs, and since there is no obstacle or forbiddance in the way of or against furnishing the information, the *cestuis* need do no more than ask for the information in order to become entitled thereto. (*Frethey* v. *Durant*, 24 App. Div. 58; *Rose* v. *Durant*, 44

id. 381.)    It would be a work of supererogation to cite the numerous cases which sustain the right of a *cestui que trust* to be informed of his affairs.

There may be occasions when the disclosure of a particular fact or a particular incident may from the business standpoint be temporarily inexpedient.    There are cases also where it is plain that information is sought in bad faith or for ulterior purposes other than the good of the corporation or its stockholders.    Such exigencies are dealt with daily in the ordinary course of the administration of the law.    In this particular case there is not the remotest suggestion that the information is sought for any improper purpose, or that the communication of the facts to the *cestuis que trust* will delay or interfere with any business or project of the corporation.

It would, of course, be idle to claim that the trustees are not able to obtain the information, for they have chosen to constitute themselves the directors.    In short, no reason of emergency, expediency or convenience is put forward.    The trustees merely declare themselves to be also directors by virtue of their trust, and in the same breath claim that by virtue of their directorate they are excused or perhaps even inhibited from giving this information.    In other words, since as directors they need account to nobody unless they be charged with wrongdoing, and since as trustees they will give no information of their acts as directors, they cannot be charged with wrongdoing; the paradoxical result would be that men who are doubly fiduciaries would be totally relieved from any substantial accountability.    My conclusion is exactly to the contrary.

As to the contention of the trustees that the limitation on their powers as directors implied in the testator's direction in his will that no property of the company be sold without the consent of the beneficiaries of the trust is illegal and unenforcible as against the public policy of the State, I fail to find any declared or implied policy of the State to that effect.    There is nothing in our corporation law to indicate that the Legislature intended that directors should have unlimited power to deal with the property and affairs of a corporation (circumscribed only by the necessarily implied condition that the dealings should be honest).    The powers of the directors are conferred to enable the business of the corporation to be transacted in the interest and for the profit of the stockholders. If the stockholders by charter or by by-law deem any limitation desirable there seems never to have been any reason for denying such right to them.    But all doubt upon that score is set at rest by the provision of section 10, subdivision 2, of the General Corporation Law: " The certificate of incorporation  *  *  *  may

contain * * * any limitation * * * upon the powers of its directors and stockholders, which does not exempt them from the performance of any obligation or the performance of any duty imposed by law."

And by section 11, subdivision 5, in which it is enacted that " By-laws duly adopted at a meeting of the members of the corporation shall control the action of its directors."

Of course, in any dealings by the corporation with third persons — a question not directly involved here — there should be adequate notice of the limited power of the directorate, and if it be deemed advisable or necessary to accomplish that result in the instant case the trustees can readily do so by amendment of the charter. That consideration, however, is here purely formal, because it is not to be presumed that the trustees would act in violation of their trust if once it be declared binding upon them. I understand that the testator's further direction that the proceeds of sales of land of the company be distributed forthwith among the beneficiaries is also claimed to be an unwarranted limitation upon the powers of the directors.

What I have just written, to my mind disposes of that objection. In so far as it may possibly be intended to imply that it is violative of any public policy of the State I may say that there is no indication that the testator contemplated that such distribution should be made in violation of section 58 of the Stock Corporation Law of 1923 regarding the payment of dividends, nor that he intended to exclude the possibility of reducing the capital if circumstances should require it as provided by section 36 of that law. The trustees evidently seem to have been of the same mind, because they have made at least two distributions in accordance with this direction.

Finally, to meet a suggestion made on the argument that the directors might deem it best to develop the property of the company by some elaborate plan involving either the sale of a considerable portion of the lands and the use of the proceeds for development, or a mortgage for the same purpose, I doubt at least whether such a course is warranted by the powers granted in the charter, and it seems to be clearly forbidden by the terms of the will. In any event I know of no public policy of the State declared or implied which demands that such power be accorded to directors of a corporation. The situation presented in the instant case is probably unique, and I have thought it best, therefore, to discuss it as upon general principles.

There is not, however, wanting ample authority for the rule that limitations upon the powers of directors of the character here involved may properly be imposed by agreement among the stock-

holders or by trust instruments of the character of this will. In *Elger* v. *Boyle* (69 Misc. 273), where a testator provided by his will for the formation of a corporation after his death to carry on his business, the stock to be held by his executors and testamentary trustees, and further provided that whatever should be done in the corporation should be with the approval of his wife, or such of certain persons named in his will as should serve as directors of the proposed corporation or a majority of them, it was decided that the executors and trustees held the corporate stock subject to the necessity of having their acts approved by the persons thus designated. BISCHOFF, J., said: " These trustees became possessed of the stock, not as their own asset, but solely by virtue of the will and of the conditions which the will imposed."

On the authority of *People ex rel. Browne* v. *Koenig* (133 App. Div. 756) he held that the condition involving the trustees' consent to a restriction of their voting power offended no rule of law or of public policy.

There is nothing to the contrary in *Boyle* v. *Boyle & Co., Inc., Nos. 1 & 2* (136 App. Div. 367). There the court pointed out that instead of submitting to and obeying the will the plaintiffs were trying to disregard what the will had instructed them to do. There is a statement in the opinion substantially to the effect that testamentary instructions cannot supersede *positive mandates* of the corporation laws — a conclusion with which all must agree, but which is wholly irrelevant to the instant case.

In *Kassel* v. *Empire Tinware Co.* (178 App. Div. 176) the plaintiff held stock as collateral security. He had not as much interest *qua* stockholder as Mrs. Mapes, who after all in equity is a stockholder. The court concluded: " As the parties to the action are the complete owners of the corporation, there is no reason why the exercise of the power and discretion of the directors cannot be controlled by valid agreement between themselves, provided that the interests of creditors are not affected. (*Groh's Sons* v. *Groh*, 80 App. Div. 85; *Spencer* v. *Lowe*, [C. C. A.] 198 Fed. Rep. 961; *Fougeray* v. *Cord*, 50 N. J. Eq. 185; *Logan* v. *New York Sugar Refining Co.*, 176 App. Div. 660.) "

To the same effect see *Dejonge* v. *Zentgraf* (182 App. Div. 43, 46); *Matter of Bush* (124 Misc. 674); *Buffalo Loan, Trust & Safe Deposit Co.* v. *Medina Gas & Electric Light Co.* (12 App. Div. 199).

In addition to the law of these cases the Stock Corporation Law of 1923 (§ 16) limits the power of directors to mortgage property, and under section 34 of the General Corporation Law it has been held legal to require a unanimous vote of directors instead of a majority vote for certain questions. (*Levin* v. *Mayer*, 86 Misc. 116.)    Stock-

holders may make any reasonable requirement to govern the conduct of the directors. (*Kavanaugh* v. *Gould,* 147 App. Div. 281, 292.) If it is right to limit the power to mortgage by law, how much more is it proper to limit the power to sell? I see no obstacle either in the charter of the company, the corporation laws of this State, or in the decided cases, to carrying out the terms of the will.

It may be the duty of these trustees, in view of the decisions and statutes just noted, to amend the certificate of incorporation or pass new by-laws. The General Corporation Law (§ 10) provides that " the certificate of incorporation of any corporation may contain any provision for the regulation of the business and the conduct of the affairs of the corporation, and any limitation upon its powers, or upon the powers of its directors and stockholders, which does not exempt them from the performance of any obligation or the performance of any duty imposed by law."

Moreover, section 5 of chapter 5 of the Laws of 1822 (the charter of this company) enacts " That a majority of the directors * * * shall have power to make and prescribe such by-laws, rules and regulations, not repugnant to the Constitution and laws of the United States, or of this State, as shall to them appear needful and proper, touching the management and disposition of the stock, property, estate and effects of said corporation."

The trustee stockholders manifestly cannot take the bequest and decline to pass the necessary by-laws. In default of such action, however, equity will consider done what ought to be done.

Findings signed. Submit decision and judgment accordingly, providing also for the appointment of a referee to take and state the account to be rendered by defendant trustees in conformity with this opinion.