In the Matter of the Estate of PETER DOELGER, Deceased.

Surrogate's Court, New York County, August 23, 1937.

*Krause, Hirsch & Levin,* for the trustees.

*John W. Hannon,* special guardian for infants, objectant.

*Mintzer & Todarelli,* for Frank G. Doelger.

*Hardy, Stancliffe & Hardy,* for Cecilia Doelger and Mary Doelger.

*Larkin, Rathbone & Perry,* for Central Hanover Bank and Trust Company, executor of estate of Peter Doelger, Jr., deceased.

*H. Maurice Darling,* for Marie Louise Bridgett and others, creditors, legatees, next of kin, etc.

DELEHANTY, S. Deceased died on December 15, 1912, survived by his widow, three sons and five daughters. In his lifetime he

operated a substantial brewing business. The ninth paragraph of his will states in part:

" Should I, at the time of my decease, be engaged on my individual account in the brewing business in which I am engaged at the date of this my last will and testament, I direct my executors to continue the same after my decease, and I also direct them forthwith, and during the life times of the two youngest children of mine, living at the time of my decease, to form a corporation under the name of the Peter Doelger Brewing Company, of which my executors shall be the directors, with such capital stock as they may deem proper, and to convey, assign, transfer and set over to such corporation, all the rest, residue and remainder of my estate, of whatever kind or nature the same may be, whether real or personal and wherever situate, including the goodwill of such brewing business and receive in exchange therefor the entire capital stock of such corporation. * * *

" I expressly order and direct, that on the formation of such corporation, the bylaws, which are to be enacted for the management of the affairs of such corporation, shall provide, among others, as follows:

" I. That no officer of said corporation, shall, at any time, receive a salary of more than Twenty thousand dollars per annum for his services to said corporation in any capacity whatsoever.

" II. That all checks or drafts on bank accounts of said corporation must be signed by at least two officers of said corporation.

" III. That no promissory note or other evidence of indebtedness be issued and no conveyance or mortgage of any of the property of said corporation, whether real or personal, be executed, except with the consent, in writing, of each director, for the time being, of said corporation.

" IV. That the proceeds realized from the sale of any real property of said corporation (other than such family residence and grounds) shall be again invested in real property appropriate for the business of the said corporation, or else in such manner and in such securities as may be permitted by law to an executor for investment.

" V. That out of the annual profits of said corporation there be applied in each year to the reduction and payment of the then existing indebtedness on the property owned by said corporation, a sum equal to at least five per centum of the amount of such indebtedness.

" VI. That dividends on the capital stock of such corporation be declared at least twice in each year, and that during the lifetime of my said wife, such dividends shall, in each year, amount to at

least one hundred and twenty-eight thousand dollars, and, after her death, to at least ninety-six thousand dollars, under all circumstances, even if the net earnings for the year during which. such dividends shall be declared shall be less than the amount of such dividends.

" VII. That no by law embodying any of the foregoing provisions can be changed except with the approval of every director, for the time being, of such corporation."

By the eleventh paragraph of his will deceased directed his executors to divide the shares of capital stock of the corporation into eight equal parts. The shares were then directed to be held in separate trusts measured primarily by the life of the widow. Upon the death of the widow if the daughters survived, as they did, each of five trusts was to continue for a period measured by the several lives of the daughters. As to the remaining three trusts outright distribution of the principal was to be effected at the widow's death to testator's three sons, assuming their survival of their mother and, with reference to the share for the benefit of Frank Doelger, further assuming that he attained the age of thirty before his mother's death. These conditions were eventually fulfilled and the three shares duly distributed.

The Peter Doelger Brewing Company, Inc., came into existence on June 1, 1913. Its incorporators and directors were the three original testamentary executors-trustees. They stated the purposes of the corporation as follows:

" *Second.* The purposes for which said corporation is to be formed are as follows:

" (a) To brew, rectify, distill, manufacture, buy, sell, import, export and generally deal in and with all kinds of beer, ale, porter, malt and other beverages, whether alcoholic or non-alcoholic; to manufacture, prepare, buy, sell, import, export and generally deal in and with all kinds of materials used in the brewing or manufacture of beverages, whether alcoholic or non-alcoholic, to treat, buy, sell, import, export and generally deal in and with all by-products resulting from the brewing, rectifying, distilling or manufacture of beverages, whether alcoholic or non-alcoholic.

" (b) To maintain cold storage plants and warehouses, for its own use and that of others; to manufacture, buy, sell, import, export and generally deal in and with ice and other articles and materials used for refrigeration.

" (c) To acquire, purchase, hold, use, lease, mortgage, sell, assign, or otherwise dispose of and all formulae, processes, trade-marks, trade-names, inventions, patents, patent rights, letters

patent of the United States, or of any foreign country, and licenses or privileges granted for the use of any of the same, and to grant licenses, privileges, rights or concessions thereunder.

" (d) To acquire, purchase, mortgage, sell or otherwise dispose of licenses to traffic in alcoholic and spirituous liquors or beverages in the State of New York and elsewhere.

" (e) To buy, sell, import, export, prepare, manufacture and generally deal in and with all kinds of goods, chattels, merchandise and personal property.

" (f) To guarantee the payment of rents reserved or to become due under leaseholds or leases; to acquire, purchase, hold, mortgage, sell, assign, exchange or otherwise dispose of leaseholds or leases; to hire or lease, acquire, purchase, hold, lease, let, mortgage, sell, convey, exchange, or otherwise dispose of real property in the State of New York and elsewhere.

" (g) To extend credit and to make loans, whether secured or unsecured, in furtherance of the business of the corporation.

" (h) To borrow money, for the purposes of the corporation, upon its bonds or notes or other evidences of indebtedness, whether secured or unsecured; to execute collateral bonds, to secure its bonds or notes or other evidences of indebtedness or any parts of the same by mortgage or mortgages or deed of trust of its property, real or personal, or franchises or any part thereof.

" (j) To do any of things hereinbefore enumerated for itself or on account of others, to make, assume and perform or secure the performance of contracts therefor; to acquire, purchase, manage, and dispose of contracts, properties and rights of all kinds, including assets, businesses and good-wills and to assume liabilities to the extent permissible to corporations under the Business Corporations Law and Stock Corporations Law of the State of New York.

" (k) To carry on any other business permissible under the Business Corporations Law or Stock Corporation Law of the State of New York, which may be carried on to advantage in connection with the business of the Corporation, or which may tend to promote its interests.

" (l) To conduct its business and to do any and all the things set forth in this certificate, in any part of the world, as principal, agent, contractor or otherwise, to the same extent and as fully as natural persons might or could do."

By-laws in literal compliance with the directions of deceased were adopted. They have never been amended by any formal action of the directors. Two thousand shares of capital stock of par value of $100 per share were issued by the corporation and delivered by the directors to themselves as trustees of the eight

separate trusts. The residuary estate transferred to the corporation in exchange for its total capital stock amounted to $6,793,746.50, consisting of the following elements:

| | | |
|---|---:|---:|
| Real estate.................................... | $5,508,137 | 46 |
| Bonds and mortgages ......................... | 183,500 | 00 |
| Promissory notes.............................. | 46,073 | 25 |
| Trade accounts............................... | 121,583 | 51 |
| License loans................................. | 73,604 | 22 |
| Loans to customers........................... | 35,428 | 77 |
| Chattel mortgages............................ | 53,238 | 00 |
| Machinery, supplies, etc...................... | 563,096 | 54 |
| Bonds and stocks............................. | 209,084 | 75 |

The real estate transferred to the corporation was of two kinds. Most of it was directly used in connection with the brewing business while the rest was employed for investment purposes. Realty of the former class was rented by deceased to saloon keepers who limited their sales of beer to Doelger beer. Realty of the second type seems frequently to have been purchased by deceased, not for direct use in his brewing business but to pre-empt locations favorable for saloon trade, thus preventing competition. The property of deceased, especially the realty which constituted the bulk of his estate, was required directly or indirectly for the prosperous continuance of the brewing business.

The first account rendered by the fiduciaries was made in their capacity as executors. A decree settling their accounts was rendered on October 18, 1917. Thereafter they acted exclusively as trustees. The death of one of the trustees on January 22, 1924, followed by the death of the widow on December 31, 1924, occasioned the first intermediate account of proceedings of the surviving trustees. At that time they accounted for the five trusts designed by the testator to continue after the death of his widow for the benefit of his five daughters. The accounts of the trustees then involved the period beginning with the decree settling the executors' accounts and ending with December 31, 1924. At the close of the accounting period the assets of the corporation had increased in value to $9,934,374.34.

The account now before the court runs from January 1, 1925, to March 31, 1936. It has been carried down to November 15, 1936, by supplemental affidavit so as to cover the whole period of service of one of the trustees who died November 15, 1936. In the interval since the 1924 accounting, investments were made by the corporation (acting through its directors, the accounting trustees) to which the special guardian objects. There are (1) the purchase

in 1927 and 1929 of shares of Manufacturers Trust Company, (2) the purchase in 1926 of eight shares and in 1928 of twelve shares of Irving Trust stock which by split-up now results in 200 shares, (3) the purchase in 1929 of 145 of the new shares of the same trust company, (4) the purchase in 1931 of a second mortgage at a cost of $194,000, (5) the purchase in 1927 of a second mortgage now representing a capital cost of $19,000, and (6) the purchase of eight separate parcels of land between 1927 and 1931 at a cost of $243,000. On the Manufacturers Trust stock there is concededly an unrealized loss. On the Irving Trust stock there was a realized loss of $2,923.18. The second mortgage of $194,000 is subject to a first mortgage of $925,000 and the whole property is now assessed at only $980,000. On the $19,000 invested in 1927 in a second mortgage no interest has been received since 1932. The eight parcels are subject variously to mortgages. The aggregate liens are $206,000. The value of the land is not determinable from the account.

The provisions of the will which relate directly to the issues raised here include in addition to subdivisions four and seven of the by-laws quoted above the following sections of clause eighteenth:

" Until the formation of such corporation and the transfer to it of my residuary estate as above provided, my said executors may, in their discretion, hold and continue any investments of my estate in the same manner as they may exist at the time of my decease.

" I also authorize and empower my said executors to invest any portions of any trust funds which they may at any time hold as such executors and trustees, in the purchase of any of the shares of the capital stock of the said corporation.

" Upon the distribution of any of the eight shares specified in the eleventh paragraph hereof, the shares of the capital stock of said corporation comprised in such share, shall, so far as practicable, be distributed in kind instead of being sold and the proceeds distributed."

It is to be noted that limited power only of retention of deceased's investments is given to the accountants. They may invest trust funds in capital stock only if of " the said corporation." Under the by-laws they are directed so to control the investments of proceeds of realty owned by the corporation that these moneys will return either to realty suitable to the business or will flow into legal investments. No general discretionary powers respecting investments are granted by deceased.

Peter Doelger Brewing Company, Inc., in pre-prohibition days, was engaged principally in the manufacture and sale of beer. After this business became illegal the corporation manufactured and

sold near-beer until June 20, 1929. On that date the corporation sold all its personal property appertaining to the brewing business. The vendee, among other assets, received the good will of the brewing business and the right to the use of the name Peter Doelger Brewing Company, Inc. On the day following the sale the corporation executed and filed a certificate pursuant to section 35 of the Stock Corporation Law whereby the purposes and powers of the Peter Doelger Brewing Company, Inc., were changed by eliminating from the original purposes and powers as set out in article second of the original charter the authorization to conduct a brewing business. This was accomplished by striking out subdivisions (a), (b), (d) and (f) of article second of said charter. There were added at that time the following provisions which constitute subdivisions (a) and (b) of article second of the amended charter:

" (a) To purchase, acquire, sell, hold, exchange, pledge, hypothecate, deal in and dispose of stocks, bonds, notes, debentures, and other evidences of indebtedness and obligations and securities of any corporation, company, or joint stock association, domestic or foreign, or of any domestic or foreign state, government, or governmental authority, or of political or administrative subdivision or department thereof, and certificates or receipts of any kind representing or evidencing any interest in any such stocks, bonds, notes, debentures, evidences of indebtedness, obligations or securities; and, while the owner or holder of any such stocks, bonds, notes, debentures, evidences of indebtedness, obligations, securities, certificates or receipts, to exercise all the rights, powers and privileges of ownership in respect thereof, including the right to vote thereon for any and all purposes;

" (b) To guarantee the payment of rents reserved or to become due under leaseholds or leases; to acquire, purchase, hold, mortgage, sell, assign, exchange or otherwise dispose of leaseholds or leases; to acquire, purchase, hold, sell, assign, exchange or otherwise dispose of bonds secured by mortgages on real property situate in the State of New York or elsewhere; to hire or lease, acquire, purchase, hold, lease, let, mortgage, sell, convey, exchange or otherwise dispose of real property situate in the State of New York or elsewhere; "

On the day when the powers and purposes of the corporation were thus modified the corporation executed a certificate of change of name pursuant to section 60 (now section 40) of the General Corporation Law whereby the corporation relinquished the name of Peter Doelger Brewing Company, Inc., and assumed the name of Peter Doelger, Inc.

The net result of changes occurring since 1913 has been the transmutation of a brewery business into a realty holding and

investment corporation.   Were the trustees' announced plans for the future to be realized, the corporation would engage hereafter in a realty promotion business.

Meantime blocks of the capital stock of the corporation have passed from the control of the trustees.   On the occasion of the widow's death in 1924, 750 of the 2,000 shares were distributed outright to the testator's three sons.   Later in 1926 the testator's daughter Theresa died.   As a result 250 additional shares underwent distribution.   None of these distributions had any effect upon the composition of the board of directors of the corporation which continued to be constituted by the original trustees until May, 1935, when because certain of the shares initially owned by testator's son, Charles Doelger, had found their way into the hands of a third party, a person other than a trustee became a director.

If the special guardian's objections are overruled and the court approves the conduct of the trustees, they propose to begin a substantial program for the improvement of the parcels of realty presently owned or hereafter to be acquired by Peter Doelger, Inc. They believe they will realize large profits.   The court must be less sanguine.   The nub of the question is whether the trustees by setting up a post-mortem corporation at the direction of deceased emancipated themselves from effective control of this court.   What departure from deceased's designs could be more radical than this very plan announced by the trustees?   Deceased directed the continuance of a brewery business and commanded his fiduciaries to remain strictly within the limits of a conservative investment policy by expressly providing that investments of available money should be made in legal securities only.   Now it is argued that by authorizing the creation of a corporation he set up a " non-conductor " between the acts of his fiduciaries as directors and their acts as trustees so that they may withdraw effectually beyond the reach of this court and be impervious to its control.   According to the trustees this is the necessary result of the fact that authority to incorporate was granted by the will.   For the actual creation of the corporation, they contend, must be attributed to the statute under which it was organized and the testator must be deemed to have intended that the directors once authorized to act through the corporate form had no need to look back at the terms of the will to decide the nature of their powers but could limit their attention to the statute under which the corporation was organized, to the general statutes affecting corporations and to the particular charter secured by them.

It is incontestable that it is the statute which brings a corporation into existence.   But the real question is: May directors of a corporation be subject to extra-corporate obligations so that while

their conduct as directors may be immune to attack on purely corporation or stockholder grounds they may yet be responsible for reasons arising from another source, namely, a will? This question must be answered affirmatively. Directors as directors may be wholly protected against stockholders as such because their actions are compatible with the corporate charter and the laws of the State. At the same time the directors may be responsible as testamentary trustees for deviating in their actions as directors from the provisions of a will. The right of the executor-trustees here to incorporate the residuary estate was an effect of and was derived exclusively from deceased's will. The limitations surrounding their exercise of the granted right do not vanish by virtue of the existence of the corporation.

The courts have consistently held that pre-organization rights and duties are not destroyed by the fact of organization. Thus in situations arising in respect of promoters who, though incapable of binding a corporation formed pursuant to an agreement among themselves, have bound one another individually in respect of benefits to accrue to them from the corporation, it has been held that no public policy is offended and no law is violated by enforcement of the agreement. (*King* v. *Barnes*, 109 N. Y. 267, 288; *Lorillard* v. *Clyde*, 86 id. 384, 389; *Elger* v. *Boyle*, 69 Misc. 273, 275, a will case; *Farmers' Loan & Trust Co.* v. *Pierson*, 130 id. 110, 122, 123.) In exactly the same way a testator may impose definite obligations on his testamentary fiduciaries relative to their conduct when they take office as directors. If the trustee-directors then violate the rules laid down by the testator they are responsible as fiduciaries independently of any responsibility which may attach to them as directors. The Surrogate's Court, which has plenary jurisdiction over testamentary fiduciaries (Surr. Ct. Act, § 40), is said to have no jurisdiction over directors *qua* directors. Though this court may decline to undertake in form to direct the action of corporate officers who are also trustees, the court may advise and control trustees relative to the powers which they have as trustees and which, if exercised, will control corporate action. (*Matter of Pulitzer*, 139 Misc. 575; affd., 237 App. Div. 808; *Matter of Steinberg*, 153 Misc. 339; *Matter of Gerbereux*, 148 id. 461.)

To differentiate the fiduciary as such from the director as such and to inspect his conduct in the directorate to ascertain his fidelity as fiduciary is a procedure expressly authorized by the Court of Appeals in *Matter of Auditore* (249 N. Y. 335). There an administrator held for an estate fifty per cent of the stock in a close corporation. As administrator " he owed to the estate an active duty to use diligence and care to preserve its value and prevent its loss "

(p. 341). As an officer of the corporation he converted its funds, and the court said: " His breach of duty as an officer of the corporation does not expunge or obliterate his breach of duty as administrator " (p. 343). It was not there a question of disregard by the surrogate of the corporate form. The court there held the administrator liable because he breached his duty as fiduciary. In the operation of a post-mortem corporation there is no need for court hesitance in commanding corporate action. Such a corporation is an instrumentality of administration. It should not be accorded any sacrosanct status. The trustee-directors here hold dual trust positions and are accordingly subject to dual responsibilities. To recognize and enforce these dual responsibilities is essential if danger to the remaindermen is to be avoided. If these trustees could escape inquiry by the surrogate into their acts as directors and could avoid correction of their departures from the terms of the will (in so far as the will does not dictate a breach of law) it might happen that they could go free of all control. For as trustees they could keep out the surrogate on the pretext that the latter could not " disregard the corporate form " and as directors they might in a practical way be inaccessible to attack. As was said in *Farmers' Loan & Trust Co.* v. *Pierson* (130 Misc. 110, 121), in a different perspective, " the paradoxical result would be that men who are doubly fiduciaries would be totally relieved from any substantial accountability."

The rule is that a testamentary fiduciary who receives under a will the right to organize a corporation remains subject to the terms of the will in so far as they are not affirmatively in contravention of law. If, departing from legal directions in the will respecting conduct of the corporation, the directors on behalf of the corporation sustain losses they will be held liable as fiduciaries however they might stand in a court of general jurisdiction when challenged by stockholders for conduct as directors of the corporation. The survey by this court of the conduct of the trustees acting as directors must in its range be unlimited, at least for the purpose of deciding how their conduct is to be regarded when viewed as the action of trustees. Were the *range* of investigation by this court held to be limited there could be no effective exercise of the court's power under section 40 of the Surrogate's Court Act.

The present case illustrates the need for control. Trustees who were authorized to organize a corporation for the conduct of a brewing business have altered the corporate character, have abandoned the purpose for which alone deceased authorized transfer of his assets to a corporation, and are now embarking on an investment program which violates the express direction of deceased's

will. These trustees have no more authority for what they now are projecting than they would have for incorporating the residuary estate of deceased if his will were silent on that subject. Indeed, they are here in worse case since they are proposing to use the text of the will to justify the corporate form and then to use the corporate form to violate the directions of the will. What an individual stockholder might do under the statutes regulating corporations is of no practical import here since the trustees-officers-stockholders are all the same persons. For this reason it is imperative that a Surrogate's Court having plenary jurisdiction over these fiduciaries should not hesitate to exercise its powers. If it does not do so those beneficially interested in the estate (who are not now stockholders) will have no forum to which they can resort for protection of their rights.

Does this court lose its power in the premises when strangers to the trust come in as stockholders or as directors? Certainly not, while the fiduciaries can control the directorate by exercise of their stockholder rights. Even when the fiduciaries lose control of the directorate by reason of stock distribution pursuant to the will, they are not thereby rendered incapable of action in support of the deceased's intentions. They can prevent the remaking of the corporation (*People ex rel. Cayuga Power Corp.* v. *Public Service Commission*, 226 N. Y. 527, 533) or its " corporate suicide " (*Matter of Timmis*, 200 id. 177, 182). They can seek enforcement of the by-laws regulating investments. (*Driscoll* v. *West Bradley & Cary Mfg. Co.*, 59 N. Y. 96.) They can compel acquisition of their remaining shares if a majority stock control took action which brought section 21 of the General Corporation Law into operation. So long as they hold one-third or more of the stock they can prevent a sale of the corporate assets. So long as they have fifty per cent of the stock they can move to dissolve the corporation if the holders of the rest of the shares are unwilling to conform to the corporate policies prescribed in the will.

The net result of this entire discussion may be summarized as follows:

(1) A testator may direct the continuation of his business through the medium of a post-mortem corporation and may bind, restrict, limit and control his fiduciaries, whether executors or trustees, by specifying the purposes and powers to be authorized by the corporate charter and the by-laws under which the directorate is to function, provided that none of his directions and limitations are contrary to law.

(2) The will containing these binding instructions is the only authority to the fiduciary for his act of applying to the State for the corporate charter.

(3) The fiduciary is never permitted so to act as director that thereby the corporate activity contravenes the *lawful* directions of the testator.

(4) Any fiduciary who violates the terms of the will by acting as corporate officer adversely to the terms thereof cannot justify his conduct before a court with plenary jurisdiction of his conduct as estate fiduciary by showing that he has acted in a manner *permitted* but not *commanded* by the general statutes regulating corporations, however perfect such answer might be in an action wherein his conduct as director might be assailed by a stockholder.

(5) An estate fiduciary may exercise the powers granted by general statutes regulating corporations only to the extent directed by the will, except that any positive act commanded by the statute must also be performed by the fiduciary acting as corporate officer.

One final argument of the accountants may be noticed. It would not be fair, they contend, to prevent the estate fiduciaries from going forward with the promotional plans which have been formed since the strangers to the trusts who now hold stock in the corporation wish so to go forward and since their interests will be adversely affected by such prevention. The answer is that a post-mortem corporation, the stock in which is subject to a trust, is more like a company organized under special act or with powers limited by statute than it is like an ordinary business corporation. " Persons dealing with corporations or associations of limited capacity must look to the character of the transactions they engage in with them. The law under which they act, and the business they are authorized to perform, is all written in the public statute book, with which every man is supposed to be acquainted." (*Gause* v. *Commonwealth Trust Co.*, 196 N. Y. 134, at p. 154.) Likewise the statutes, the charter and the will which affect the conduct of a post-mortem, trust-subjected corporation are open to inspection. One who takes shares in such corporations takes them subject to the limitations with which the corporation is circumscribed. Each holder of stock in the present corporation knows that the corporation has no authority to invest in non-legal securities once it engages to make a true investment because such holder of stock knows that the by-laws forbid it (*Matter of American Fibre Chair Seat Corp.*, 241 App. Div. 532, 535; affd., 265 N. Y. 416), as also does the will.

The court, at the request of the parties, has passed first on the legal problems involved since no further action would have been required if the trustees' position had been held valid. A hearing on the facts for the purpose of determining the money liability of the trustees will be held on October 11, 1937, at ten A. M. Proceed accordingly.